**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **THE ESTATE OF** | : | |
| **RAYLYN GEORGE,** | : | |
| | : | **3:08 CV 1023 (VLB)** |
| **Plaintiff,** ` | : | |
| **vs.** | : | |
| | : | |
| **Bridgeport Police Officers LUIS** | : | |
| **BATISTA, HUGE TOBIN, and John** | : | |
| **Doe 1, John doe 2 (in their official** | : | |
| **and individual capacities) and** | : | |
| **CITY OF BRIDGEPORT** | : | |
| ` | : | |
| **Defendants.** | : | **JUNE 14, 2010** |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFFS' OBJECTION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGEMENT**

**I.    Introduction**

Plaintiff claims deprivation of his federal civil rights in that as a result of the Defendants' conduct, the plaintiff lost his life. The defendants all acted with intent, and/or gross negligence and/or with reckless disregard to the health, safety and civil rights of George which caused him to lose his life.  Also, the Plaintiff specifically argues that the Defendant, City of Bridgeport, has a custom, policy or practice of allowing officers to use excessive force without consequence, (failure to train), covering up for damages caused by such excessive force, (failure to honestly and thoroughly investigate citizen complaints) – especially when those citizens are persons of color.

**A**

1

## A GENUINE ISSUE OF MATERIAL FACT EXISTS BECAUSE THE PLAINTIFF SUFFICIENTLY PLEAD THAT OFFICER BATISTA CAUSED THE PLAINTIFF TO LOSE HIS LIFE

Defendants argue that summary judgment should be granted in their favor because Plaintiff did not specifically say that Officer Batista shot the plaintiff; however, the complaint clearly states that Officer Batista and / or Officer Tobin caused the Plaintiff to lose his life.  Because the medical examiner makes it clear that the cause of death was a gunshot wound to the head, and that the manner or death was homicide, it is clear the plaintiff alleged that Officer Batista or Officer Tobin was responsible for firing the weapon into the plaintiff's scull, ultimately causing his death.  (*See Exhibit 7*).  The Defendant, Officer Batista, was the only person listed as a suspect.  (*See Exhibit 11*).  Pleading in the alternative has always been acceptable way of pleading.

### B.
### MATERIAL ISSUES OF FACT EXIST AS TO WHETHER DEFENDANT BATISTA FIRED THE 40 CALIBER GLOCK RESPONSIBLE FOR THE DEATH OF RAYLYN GEORGE.

Defendants claim that there are no material facts in dispute as to liability of Officer Batista because no evidence exists to show that Officer Batista's weapon was the cause of the plaintiff's fatal wound and that no witness can put Officer Batista close enough to the Plaintiff at the time he was fatally injured.  However, it is well known, and this Court should take judicial notice, that circumstantial evidence and direct evidence are equal in the eyes of the law.  It should be noted, that the Plaintiff never alleged that Officer Batista's duty gun was responsible for the fatal wounds to the plaintiff.  Instead, the Plaintiff alleges that Officer Batista

2

was the person responsible for firing the 40 Caliber Glock which caused the death to the plaintiff.  The evidence in support is as follows:

### B-1. THERE IS EVIDENCE THAT OFFICER BATISTA WAS IN THE YARD OF 103/105 PARK TERRACE ALONE WITH THE PLAINTIFF FOR SUFFICIENT TIME TO COMMIT THE HOMICIDE

Defendants make a big deal of the fact that the fatal shots did not come from Officer Batista's duty weapon (a 9mm Baretta).  The Plaintiff never denied this.  However, there are disputed facts for a jury to determine who fired the 40 Caliber Glock. (The gun alleged to be the Plaintiff's).  (*See Exhibit 14– weapons inventory*).

First, it was the Defendant that admitted in his Motion to Dismiss to this Court, "the defendant does not deny that the plaintiff was shot in the leg by an officer." (*See Exhibit 1, Defendants' Motion to Dismiss, page 2).*  This is a judicial admission because the Federal Rules require a defendants' counsel to make good faith efforts to secure all facts in their pleadings as well as their answers to interrogatories and requests for production from their client before placing facts into the record.  *See, Rule 11 (b).*  See also, Hoodhov. Holder, 558 F.3d 184, 90 (2nd. Cir 2009).  This, in and of itself, might be a basis for a Plaintiff's motion for summary judgment, because the bullet which caused the injury to the plaintiff's leg was discharged from the same pistol that caused the fatal wound to the back of the plaintiff's head and most likely the shooter.  (*See Exhibit 2 and Exhibit 4 – Sketch Map #7 and 45*); *(Exhibit 8, page 53).*

Furthermore, Officer Batista admits that at one point during the foot-chase,

the plaintiff threw his gun to the ground.  (*See Exhibit 10 – Batista's Statement*).

This information shows that Officer Batista had an opportunity to seize the gun

during the foot-chase.  Officer Batista's claim is that after the plaintiff threw the

gun to the ground, then changed his mind and picked the gun back up and

pointed it at Officer Batista.  But when taken in context with Officer Batista's

testimony about what prompted him to fire at the plaintiff and where Officer

Batista and the plaintiff were when Officer Batista was firing his weapon, it is

clear from the scientific evidence and the discrepancies in his testimony, that a

jury would find Officer Batista's statements incredible and that it was more likely

that Officer Batista had an opportunity to pick the 40 Cal. Glock up and use it, and

he did. [At his deposition, Officer Batista testified that he fired the three shots

from his duty weapon at the plaintiff while he was standing still directly across

the street of 103 & 105 Park Terrace on the north side of Park Terrace and the

plaintiff was in-between 103-105 Park Terrace. *(Exhibit 3, Pages 9- 12)*. However,

the sketch map created by Detective Keith directly contradicts Officer Batista's

testimony by depicting the bullet casings as being found in a trail going east from

the corner of Park Terrace and Columbia Street and moving closer to the south

side of Park Terrace, in front of 103/105 – some distance apart. *(See Exhibit 4 –*

*Sketch Map, #3, #4, #5)].*

Officer Batista, in his own deposition, admitted that he had seen that the

4

plaintiff in the back yard, that the plaintiff was bleeding profusely from the head, and that he thought he was responsible for shooting him; whereby, he sought help from the emergency room for an anxiety attack:

" Q    Okay, why did it take so long to write this report?

  A    I was out due to the shooting.

  Q    Okay, and what was the reason you were out? I know due to the shooting, but what happened?

  A    I wasn't, you know, feeling too good about it at the time, I guess, and they told me to take my time.

  Q    Okay, and you weren't feeling too good about it because you thought you shot Mr. George?

  A    Yes.

  Q    Okay, but you didn't tell anyone that?

  A    No. . . .

  A    When, you know, they gave me my shot, they medicated me. I don't know how long was the time." (*See Exhibit 3, pg. 24-25 and 36*).

It is also disputed that there were no known witnesses to the shots fired into Mr. George, and therefore, the direct cause of his death is a matter for a jury to determine.  No one testified that Officer Batista did not fire the fatal shots. In fact, Officer Speranza testified that the scene was chaotic, there were other suspects being chased, and it is unclear how many other guns were going off around this time. *(See Exhibit 12 – Officer Speranza's Deposition, page 13).*

5

Officer Batista himself testified that he was in the back yard alone with the suspect before any other witnesses arrived:

" Q    Okay, when you arrived in the backyard, what did you do when you saw Mr. George?

A    I walked up to him, I saw him bleeding, and I just looked at him, and by that time Officer Simpson arrived and I asked him to call the medics.

Q    And where did you think he was bleeding from?

A    I could see from the head.

Q    Okay, and when you arrived in the backyard, was anybody else there?

A    No.

Q    Okay, could you see anybody in the adjoining yards?

A    No

Q    Okay, you couldn't see anybody on the right-hand side of the fence where George was?

A    Not at the time I arrived to the backyard.

Q    And you couldn't see anybody on the left-hand side of the house?

A    No.

Q    Okay, and you couldn't see anybody in the rear yard on Gregory Street?

A    Gregory Street is parallel to Park Avenue.

**A      No.**

**Q      Okay, and who was the first Officer that reported to the scene after?**

**A      Officer Simpson**

**(Exhibit 3, page 31-33).**

Direct testimony by Officer Speranza, a Bridgeport Police Officer, places Officer Batista alone in the backyard at the time of the shooting:

"I watched as the TNT Officer pursued the suspect from Columbia Street onto Park Terrace I stopped my police vehicle at Columbia Street and Park Terrace.  As I was pulling up, I heard multiple gunshots and exited my vehicle and took cover.  (While running to take cover I saw a bunch of people scattering from the blue house on the corner and instructed them to go back into their house.)  I could see the suspect that was being pursued turning from side to side looking back at the TNT Officer.  I could still see the TNT officer about a hundred feet away with his weapon drawn at the corner of the green house.  I had taken cover behind the burgundy SUV.  The suspect who was being pursued had run to the back of the green house at this point I no longer had a visual on the suspect.  The TNT officer (now known to me as Officer Batista) paused before moving any further, Officer Bataista then proceeded to the rear of the home I could hear him scream loud orders.  Officer Batista stated something to the effect of "drop the weapon" "drop it now".  The orders were loud."   See, (*Exhibit 19, Officer Speranza's Statement to Sgt. Prebish*).

*(Exhibit 19, Officer Speranza's Statement through Sgt. Prebish and report from*

7

*CSP on interview with Speranza).*

Officer Christopher Martin testified during his deposition to a time line that allows at least a minute after the gunshots were fired where Officer Batista was alone in the yard with the suspect.  He stated that he had gotten out of his vehicle on the Corner of Park Terrace and Columbia Street, started walking down Park Terrace, heard gunshots from the right, went back to his vehicle and to get a weapon, took cover, then proceeded back down Park Terrace doing a procedure called "concealment and cover," heard radio traffic about a suspect on Gregory street, and as he arrived at the intersection of Columbia Street and Park Terrace he looked to the left and saw Officer Batista alone in the yard looking down — Sgt. Pribesh was clearly still not there.  (*See, Exhibit # 22, Pages 7-10*).

When defendant's counsel asked Dr. Carver whether given the time limitations of a minute from the time of the gunshots to the time that Batista was seen in the yard, Dr. Carver testified that: "Your - - I don't know. A minute is a long time in a gun fight, so . . . I don't know, it's potentially conceivable . . . " *(Exhibit 8, page* 81-82).

Sgt. Prebish's report to Captain Samatulski, the substance being: "As I approached, I heard several gunshots.  At this point I turned toward Park Terrace and began running in that direction to assist the officers taking gunfire.  I saw Officers Speranza and Martin taking cover behind vehicles on Columbia Street. There were two foot pursuits being conducted . . . at that time, both of them had similarities making it difficult to decipher the directions of the two suspects being

pursued, as the officers in pursuit were at opposite ends of Columbia Street. . . . I then heard more gunshots and ran up Park Terrace into a rear yard where it sounded like the gunshots had come from.  As I got to the rear yard I saw the suspect on the ground against the chainlink fence with Officer Batista pacing back and forth." (*See Exhibit 20, Sgt. Prebish's report to Captain Samatulski*). Yet, in her Deposition, she told a different story; whereby, she saw the suspect just going over the fence falling and then saw Batista coming around the side of the house and then begin pacing. (*See, Exhibit 13, 11-16*).

It should be noted that Sgt. Prebish was interviewed on several occasions. During her interview with CSP Badge #1246, according to the Officer, she stated as follows: "when she heard the next two shots, she was at the intersection of Columbia Ave and Park Terrace." . . . as she got near 103-105 Park Terrace she could see the victim slumped on the ground against the chain link fence.  Sgt. Prebish stated that it appeared to her as if the deceased had just finished dropping to the ground.  She stated it was only a matter of seconds from when she heard the two shots until she got to the rear of 103-105 Park Terrace.  Sgt. Prebish then stated that as the entire backyard came into her view, she could see officer Batista pacing back and forth in front of a large tree located on the opposite side of the yard." (*See Exhibit 21, Sgt. Prebish's interview with #1246*).

B-(2).  THE SCIENTIFIC EVIDENCE SUPPORTS THE MORE
            PLAUSIBLE EXPLANATION THAT THE PLAINTIFF DIED AS A

## RESULT OF HOMICIDE

The scientific evidence itself weighs more heavily in support of a conclusion that the manner of death was homicide rather than suicide. (*Exhibit 8, page 25, 40- 45*).  Officer Batista was the only suspect.  *(See, Exhibit 11 listing the plaintiff as the victim and Officer Batista as the Offender*).  There was no gunshot residue found on the hands of the plaintiff; *(See Exhibit 15*, GSR); the location of the wounds were more consistent with homicide than suicide, (*See Exhibit 8 – pg. 25*); there were no identifiable fingerprints on the weapon, (*See Exhibit 15-1, Fingerprint results)*; the shell casings found near the body were located on both sides of the body; (*See Exhibit 4*) even though the injury to the leg was located on the same side as the fatal wound to the head (*See Exhibit 7*); and the muzzel-to-target distance from the fatal wound was three inches away from the head and 3/4" to the rear of the ear and 3/4" above the ear – the back of the plaintiff's head, (*See Exhibit 15-2, Muzzel-to-target report*).

In addition, the medical examiner's autopsy report, states that a Bridgeport Police Officer told him that a Bridgeport Police Officer shot Plaintiff.  *(See Exhibit 7 – Autopsy Report)*.  Dr. Carver's original conclusion was HOMICIDE.  *(See Exhibit 7 – Autopsy Report)*.  Although Dr. Carver changed his final conclusion to UNDETERMINED seven months later, claiming the wounds were self-inflicted, *(See Exhibit 7 – Autopsy Report)*, when asked why he changed his conclusion, he stated that he did so based mainly on Attorney Benedict's report of what the police officers claim the witnesses said - triple hearsay – and the pressure from

10

Attorney Benedict and other Officers to re-consider his conclusion. *(Exhibit 8, page 37 and 39).* Dr. Carver provided documentation of the times and dates that he met with Attorney Benedict and other officers. (*See Exhibit 9, Documentation of Meetings*).

Further, Dr. Carver testified that it is unusual to take seven months to make a final conclusion as to manner of death and that he probably took too long. *(Exhibit 8, page 34-37).* He stated that the reason he changed his conclusion so late was because "this was a very significant change" and he wanted to wait to see if any further evidence came his way. *(Exhibit 8; page 34-37).* The "very significant change" was clearly solely based on hearsay, not the physical evidence.

Dr. Carver went so far as to testify that the location of the fatal gunshot wound to the head is more consistent with a homicide than a suicide or an accident. *(Exhibit 8, page 25).* Dr. Carver even said that it is conceivable that Officer Batista followed Mr. George behind the house, wrestled the gun away from him, and placed himself in a position to cause both wounds before others were in the backyard, which all occurred in approximately a minute. *(Exhibit 8, pages 81-82).* Because Officer Batista alleged that George at some point, actually threw his weapon, reasonable people could conclude that it was at that point that Officer Batista picked up the 40 Cal. Glock and shot the plaintiff in the head. (*See Exhibit 10 – Batista's Statement*).

Dr. Carver testified that with reasonable medical probability, whoever shot

11

the plaintiff in the leg is the most reasonable suspect for shooting the head.

*(Exhibit 8, page 53).* Again, *"the Defendants do not dispute that the decedent was shot in the leg by and officer." (Exhibit 1 – Motion to Dismiss).*

The Doctor testified that there was no scientific evidence that contradicted his original conclusion of homicide, and in fact, if anything, supported that the manner of death was more likely than not, homicide.  (*Exhibit 8, page 40- 45).*  But according to the Mission Statement of the Office of the Chief Medical Examiner listed on it's website the medical Examiner's job is to scientifically determine the manner of death –  not to determine the credibility of witnesses.  (*See, Exhibit 18, OCME Mission Statement*).  In any event, it is well settled that the credibility of witnesses are factual questions within the sole province of a jury. Standard Jury Instructions state that the jury can believe all, some or none of the witnesses testimony, both expert witnesses and lay witnesses.  United States v. Gleason, 616 F.2d 2, 15 (2nd Cir. 1979), (cert denied).  Therefore, summary judgment, as a matter of law, cannot enter on behalf of the defendants.

Surely one cannot be shot, then un-shot without creating a genuine issue for a jury to consider . . .  surely the defendant cannot be named a suspect in a police related shooting, where the victim was named Raylyn George and the offender was named Officer Batista without creating a genuine question of material fact for a jury to consider.  (*See Exhibit 11 – State Police Cover Sheet).*

### B-(3)  CONCLUSION AS TO OFFICER BATISTA

12

The Defendants claim that because there were no witnesses to the plight of the plaintiff's fatal injury to the head, and because the defendant Batista made a self-serving statement where he claims he was not a witness either, there is no genuine issue for the jury to determine and summary judgment should enter for the defendant. However, the fact that there was an original allegation of homicide, that Officer Batista was named the Offender, that the Plaintiff George was named the victim, that the medical examiner originally ruled the manner of death a homicie, that officers place the defendant Batista in the yard alone at the time the fatal shots occurred, and that all of the forensic evidence weighs more heavily in favor of homicide, not suicide or accident, a genuine issue of material fact exists for a jury to decide.  The fact is, the jury is to decide, in light of all of the evidence, whether the testimony of witnesses is or is not credible. United States v. Gleason, 616 F.2d 2, 15 (2nd Cir. 1979), (cert denied).

<u>C</u>
THERE IS AN ISSUE OF MATERIAL FACT FOR A JURY TO FIND THAT THERE

WAS A COVER UP / CONSPIRACY

It should be noted that Defendant Batista admits he was transported from the scene to the hospital by a fellow Bridgeport Police Officer; that he was then transported from the hospital to his home by Officer Ronan, one of his colleagues from TNT; that he undressed in his room with the door closed; that he and his wife collected his own evidence to submit to the forensic lab for testing; that he was again transported to TNT by TNT Officer Ronan, and that he *may* have washed his hands before returning to TNT headquarters for gunshot residue

13

testing.  *(See Exhibit 3 – pg. 18-24)*.  Although it is undisputed that no gunshot residue was found on Officer Batista's hands it is also undisputed that he fired his gun three times.  Officer Batsita testifies in his deposition that he might have washed his hands. *(Exhibit 3 - page 24)*.

All of the facts above were a direct violation of *G.G.S. § 51-277a* which provides that whenever an officer, in the performance of his duties, uses deadly force against another, and the other person dies as a result, the investigation is referred to the State Police for investigation.  *(G.G.S. § 51-277a)*.  Presumably this statute was created in order to preserve the integrity of the investigation.

In addition, according to the protocol of the Judicial District of Fairfield, the only involvement of the municipal officers should be in securing the scene.  (See, *Exhibit 17, CSAO Report of State's Attorney Benedict) and (Exhibit 16, G.G.S. § 51-277a (a) )*.

Moreover, instead of appointing a special prosecutor in another jurisdiction or referring the investigation to the Chief State's Attorney, the investigation and determination of appropriate force was done by the State's Attorney for the Judicial District of Bridgeport – a direct conflict of interest.  *(See Exhibit 16, G.G.S. § 51-277a (b)*.

Based on the above, a jury could infer that the City of Bridgeport was in complicity with the cover up of the circumstances involving the homicide of the plaintiff.  Certainly one cannot investigate oneself without tainting the integrity of the investigation.  Especially in Bridgeport, where The Barros Decree outlined

specific requirements in conducting investigations for It's Office Of Internal

Affairs.  (See Exhibit 31, Barros Decree).

<u>**D.**</u>
**<u>THERE IS AN ISSUE OF MATERIAL FACT AS TO WHETHER OFFICER BATISTA
USED EXCESSIVE FORCE IN FIRING AT THE PLAINTIFF</u>**

The Plaintiff does not dispute that Officer Batista had his duty gun drawn

while he was pursuing the plaintiff. *(Batista Deposition Exhibit 3– page 8)*.

However, it is disputed whether the plaintiff's hands were in the air the entire time

while Officer Batista was pursuing and firing at the plaintiff from Ridge Avenue to

Columbia Street and then to Park Avenue. (Exhibit 10, Exhibit 3 – page 15). It

should be noted that the protocol for a Bridgeport Police Officer to use of deadly

force is that deadly force is to be used by an officer only when the officer is faced

with deadly force and / or a civilian or an officer's life is in danger. *(Exhibit 3,*

*pages 15-16)*; (*See also, Exhibit 6 , Bridgeport Guidelines for Use of Deadly*

*Force*).

Here, because there is evidence that the Plaintiff was running away at the

time that Officer Batista was firing at him, no person, Officer Batista or any other

officer or civilian was in imminent danger at the time.  Therefore, Officer Batista's

use of his firearm while in pursuit of a suspect who had his hands in the air was

in fact, in and of itself, excessive force. (*See Exhibit 6, Bridgeport Guidelines for*

*Use of Deadly Force*).


Further, Defendant Batista used excessive force in firing at the plaintiff

while Plaintiff's back was turned away from the Defendant and his arms were in the air.  Officer Batista's statements about how and where he fired his weapon at the plaintiff are completely contradicted by scientific evidence.  For instance, it is disputed whether Officer Batista fired three rounds at the plaintiff while the Plaintiff was running away with his back towards Officer Batista along Park Terrace or whether all of the rounds were fired down the side of 103/105 Park Terrace in tandem while Officer Batista was standing still across the street.

At his deposition, Officer Batista testified that he fired the three shots from his duty weapon at the plaintiff while the Defendant was standing still directly across the street of 103 & 105 Park Terrace on the north side of Park Terrace and the plaintiff was in-between 103-105 Park Terrace. *(Exhibit 3, Pages 9- 12).* However, the sketch map created by Detective Keith directly contradicts Officer Batista's testimony by depicting the bullet casings as being found in a trail going east from the corner of Park Terrace and Columbia Street and moving closer to the south side of Park Terrace, in front of 103/105 – some distance apart. *(See Exhibit 4 – Sketch Map, #3, #4, #5).*  The sketch map scientifically proves that Officer Batista fired his weapon while he was moving south-east from the middle of the street of 122 & 120 Park Terrace and the empty lot on corner, (#3), then to the front of 111 & 109 Park Terrace (#4), and finally, in front of and  in between 111 & 109 and 103-105 Park Terrace, rather than standing still in front of 103 & 105 Park Terrace. *(See Exhibit 4 – Sketch Map #3, #4, #5).* Officer Batista's claim that he fired at the plaintiff in reaction to the Plaintiff's actions (when the plaintiff

16

allegedly stopped between the east side of 103 & 105 Park Terrace, threw his weapon to the ground, changed his mind and picked it up and then pointed it at Officer Batista while moving forward, in the same direction) is completely in contradicted by the scientific evidence, given the location of his cartridge casings along Park Terrace.  Officer Batista specifically testified that he did not see the weapon until George allegedly pulled it out . . . and that he fired three shots, one after the other into the side alleyway of 103/105 Park Terrace while standing still across the street.  (*See Exhibit 3, pg. 8-15).*  Certainly this was an attempt by Officer Batista to justify his use of force. [It should be noted that it is undisputed that the plaintiff never fired a weapon at officer Batista. *(Exhibit 3 – page15)*].

### E.

### CLAIMS AGAINST JOHN DOES ONE AND TWO

There are no additional parties the plaintiff intends to join; therefore, we abandon any claims against John Doe's and the Court should grant Summary Judgment for those parties.  The officers and supervisors connected with the investigation in this case sufficiently support the grounds under Monell without naming specific officers / supervisors as defendants.

**F.**
**CITY OF BRIDGEPORT HAS A CUSTOM, POLICY OR PRACTICE OF NEGLIGENT
HIRING,  TRAINING, SUPERVISION, AND DISCIPLINE INT'S OFFICERS**

The plaintiff alleges the city failed to properly train and discipline in (a) the

proper use of deadly force, (b) limitations and procedures on their authority as

police officers in terms of investigation of an officer-related shooting, (c) the

requirements for gunshot residue testing of officers and the importance of

preserving evidence.  In support, the plaintiff states the following:

**A)      FACTS RELEVANT TO MONELL**

The Defendant City admits that at all relevant times, the individual

Defendant acted toward the Plaintiff in accordance with a custom, policy or

practice of the Bridgeport Police Department. *(Exhibit 23, Defendant City's*

*Response to Plaintiffs Request for Admissions, Question 1).* The City also admits

that at all relevant times, the individual Defendants acted toward the Plaintiff in

accordance with their training and experience of the City of Bridgeport. *(Exhibit*

*23, Question 2).* Further the city admits that neither the defendants nor any

officer, supervisor or detective, in plain clothes or uniform, present at the scene

were disciplined for their actions during this incident. *(Exhibit 23, Questions 5*

*and 6).*  If a jury was to find that the Defendant Officer(s) violated the plaintiff's

constitutional rights, it could well find that the City had a custom policy or

practice of allowing it's officers to use excessive force without any corrective

action.

In addition, the Bridgeport officers involved in this incident, supervisors, special task force officers and patrol officers, either admit to the fact that they were not trained in the policy of the Fairfield County Judicial District and Connecticut General Statutes regarding investigations of police related shootings or claim they were trained, but suggested that there are instances to which the policy and statute can be skirted; however, they were not specific as to what circumstances would qualify. (*Exhibit 3 - page 17, Exhibit 24 Officer Ronan's Deposition - pages 10-14*).

Officer Batista was allowed to be transported to the hospital by an unknown Bridgeport Police Officer, then a fellow TNT member, Officer Ronan, transported him to his home to collect his own evidence behind closed doors and by himself, then possibly wash his hands and possibly other evidence from his person.  Officer Ronan then again transported Officer Batista to headquarters by that same colleague from TNT to submit his evidence and GSR testing. (*Exhibit 3 - page 18, 21-25*).  The reason Sgt. Pribesh gave for violating the protocol was vague to say the least.  ( *Exhibit 13 - pages 25-28* ).   It should be noted that the supervising officers also testified that if the circumstances were reversed, the suspect would not be allowed to drive around with his buddies and collect his own evidence; admitting that they believed that just because police officers were police, they were more trustworthy.  (*Exhibit 24 - page 13-14, Exhibit 25 Captain Samatulski's Deposition - page 17,  Exhibit 36 Officer Leonzi's Deposition - page 21* ).  All the other officers claimed that they didn't see anything wrong with the

police officer collecting his own evidence and destroying evidence by washing his hands and being driven around for an hour and a half before having to encounter State Police. (*Exhibit 24 - page 11*). Captain Samatulski admitted that he himself would not have washed his hands in this circumstance. (*Exhibit 25 - page 16*).

Though many officers were in the vicinity of the shooting, they all denied that they saw the Defendant Batista shoot the plaintiff or that he ever admitted he thought he was responsible for shooting and killing the plaintiff. (*Exhibit 12 - page 29, Exhibit 36 Officer Leonzi's Deposition - page12-14*). Sgt. Pribesh even went so far as to say she saw the suspect fall off the fence, but did not see anyone shoot him. She also made contradictory statements about when and where she first saw Batista after the suspect was shot. (*Exhibit 13 - page 12-14* ).

After a meeting with the NAACP in Bridgeport the press asked Chief Brian T. Norwood about the investigation and he stated, "the whole thing predates me by about three years." It should be noted that the incident occurred on August 25, 2005 and Chief Norwood became Chief on April 23, 2006. (Exhibit 41-2). His nonchalant answer to this inquiry shows the reckless disregard and lack of concern for the investigation of a suspicious death of a citizen involving his police department.

It should be noted that when Attorney Weinstein made a Freedom of Information Request for certain documents regarding the investigation, Assistant City Attorney Melanie Howlette represented that she had searched the

department and the Bridgeport Police Department maintained no documents relating to the investigation.  Later, right before a hearing for attorneys fees for failing to make a good faith effort to provide the documents, Assistant City Attorney Melanie Howlette disclosed approximately 30 documents she claimed were filed in the wrong place.  (*See Exhibit 26 Fairfield Weekly, February 22, 2007 to 28th 2007*).

This is a common practice of the Bridgeport Police Department, to claim that no one witnessed the plaintiffs injury because they either were not present or were concentrating on their own part in the arrest.  (Colin Young [2005] and Tshidiadia [2004]).   The following history shows a custom, policy or practice of the Bridgeport Police in condoning the use of excessive force by it's officers:

In 1970, <u>Arroyo v. Walsh</u>, 317 F. Supp. 869 (1970), the Court decided against the officers involved in his attack where his nose was shattered to the point where his eye sockets and cheek bones were broken and chipped. The Court noted that each officer testified, after being sequestered, that their police reports were written by their own spontaneous recollection, even though the reports were identical; even down to punctuation, spelling and grammar errors. (*Exhibit 27).*

In 1985, the City was sued again in <u>Colquit v. Christy</u>, Docket no. B-85-546 (EBB).  There, while responding to a possible domestic dispute, the police entered the house without a warrant and arrested a black male while exposing him to racial epithets, and beat him so badly he was in the hospital for 10 days.

(He had fractures to his jaw, a cerebral contusion, lacerations and bruises to his face, eyes and lips, and a hematoma on the back of his head).  The Court, J. Timbers, credited the plaintiff's story because the officers gave conflicting testimony as to how the injuries were sustained.  Some testified that he was injured in his attempt to escape, some that he was injured in the car accident he was in, and some told the nurse at the hospital that he was injured in a domestic dispute. (*Exhibit 28* ).  The police officers involved were convicted of reckless endangerment in the first degree, then promoted to Sargent.  (*See Exhibit 29 Request for Admissions to Russo, #16*).  This case resulted in the largest award in attorney's fees in civil rights history. It should be noted that in order to preserve confidentiality, the City offered twice the amount of settlement offered the day before.  (See Exhibit 29b, Settlements of City).

In 1985, the Barros Decree was created.  Barros v. Walsh, B-482 (RCZ), (District Court 1985). [The Barros Decree was an order by the Federal Court as to how citizen complaints would be handled by the Office of Internal Affairs]. This Order is still in effect and has had to be modified on two occasions since. (*Exhibit 31, Barros Decree*).  Barros was involved in a housing demonstration which resulted in a riot.  The involved police officers each signed their police reports with a lieutenant's name as a witness when he was not present at the time. Barros v. Walsh, B-482 (RCZ), (District Court 1985).

In 1990, (Gordon v. Villegas), police officers were accused of barging into a Jamaican grocery without a warrant and robbing Gordon and his brother. During

the investigation, the plaintiff passed a polygraph.  The officers refused to cooperate with the investigation by State's Attorney Bennedict, claiming advise of their attorneys, and Attorney Benedict wrote to the Board of Police Commissioners his disappointment and frustration in the lack of professionalism in the Bridgeport police Department and referred the investigation to them. (*Exhibit 30 - Attorney Bennedict's Letter to Police Commisioners*).  Those officers were involved in 12 lawsuits during the pendency of the proceedings, yet were promoted over 40 times.

In 1992, the City was sued again for excessive force after entering the home without a warrant and arresting an occupant who was assaulted in the process in <u>Pfeffer v. Bridgeport</u>, Docket No. 92-9024 (2nd. Cir. Supp. Op. 1992).  On this occasion the Court held that it was proper for the Court to consider testimony about pending lawsuits and prior settlements for similar types of suits in order to show that the Department failed to take corrective action after complaints were filed against its officers.(*Exhibit 32*)  In addition, the officers involved were promoted to Sergent.  (See testimony of Chief Sweeney in <u>Felsman v. Bridgeport</u>, Docket No. 5:89 CV 272, where Chief Sweeney admitted that the Officers Haplin and Christy were convicted of reckless endangerment in the first degree, a class A misdemeanor, and then promoted to Sergeant.  He also testified that because the matter was resolved, the Board could not use that conviction in evaluating their eligibility for promotion.  He quipped, "I don't write the rules Mr. Weinstein."  **(<u>Felsman v. Bridgeport</u>, Docket No. 5:89 CV 272, (1989), testimony of**

Chief Sweeney, Pg. 3), (*Exhibit 33*), (CF Pfeffer).  What rules?

In 1994, the City was sued again in <u>Calovine v. Bridgeport</u>, 3:94 CV 379 (WWE) for entering an apartment with a faulty warrant where the wrong apartment number was listed along with the wrong floor.  The officers, including a Sargent, should have known the warrant was faulty because they were involved in surveillance of the apartment.  Nevertheless, they rammed the door wearing ski masks and failed to identify themselves.  In addition, the inventory of the items taken again listed the wrong apartment number. (*Exhibit 34*)  No disciplinary action was taken against any of the officers. (See Request for Admissions, #4).

In November 2000, Judge Hall granted an injunction against the City of Bridgeport when It's police officers continuously arrested people who came to the needle exchange office to exchange their used needles for new ones. A statute created in 1992 decriminalized the possession of up to 30 used syringes in order to exchange them for new needles in order to prevent the spread of AIDS. Nevertheless, Bridgeport Police continued to willfully violate the statute and arrest citizens outside the clinic for possession of drug paraphanalia and residue. (See Exhibit 44-11, Article).

In <u>Russo v. Bridgeport</u>, 479 Fed. Supp. 196 (2nd. Circuit 2007), (Cert. Denied), the plaintiff was arrested for a larceny.  Russo protested his innocence from the beginning, asking officers to simply view the video.  Russo had tattoos all over his arms, the video clearly showed the suspect did not.  Officers refused to look at the video, placed the exculpatory evidence in their locked desk drawer,

and did not inform the prosecutor.  The officers also attempted to elicit a false

confession by offering to obtain methadone for him, (he was suffering from

withdrawal) and recommend a three year sentence for the robbery. The Officer

stated that he not only viewed the video tape, but also measured the tattoos of

the suspect with after measuring Russo's, claimed they were a match.  Russo

continued to proclaim his innocense and refused the offer because he knew the

officers were lying.

　　　　Russo spent over SEVEN MONTHS in prison until the prosecutor looked at

the exculpatory tape and dismissed the case.  Russo sued. During the discovery

period in the lawsuit, the City admitted that the officers acted in accordance with

their training and experience and a custom policy or practice of the City of

Bridgeport. (See Request for Admissions #'s 11 & 12).  The defendant's motion

for Summary Judgment was denied.  (*See Exhibit 35*).  The defendant's motion for

summary judgment was denied. (*Emphases added*).

　　　　In Barksdale, et al v. Biehn, 3:06CV1271 (AHN), defendant Biehn went on a

shooting spree in Marina Village after he left a police function where he was

became intoxicated.   In his application to the Bridgeport Police Department, he

had disclosed a lengthy arrest record, including crimes of violence, a DWI, and

other misdemeanors within a short period prior to his application, showing his

conscious disregard for the law.  *(See Exhibit 37; John Biehn Record), (Exhibit

37-1, Biehn Application).*  Defendant Biehn also disclosed in his application to the

Bridgeport Police Department, his credit problems, a juvenile incident of

shoplifting, smoking marijuana on several occasions, and becoming intoxicated at least nine times in the twelve months prior to his application. *(Exhibit 37-1).*

As a result, Defendant Biehn's application was initially denied by reason of "conduct and morals," namely, "Arrest History," "Illegal Gambling," "DUI," "Driving an Unregistered Motor Vehicle," and "Domestic Violence." *(See Exhibit 37-2; John Biehn Appeal to Bridgeport Civil Service Commission).* After appeal, at some point, Internal Affairs found that there were "no areas of concern." *(Exhibit 37-1, Application).* Nevertheless, when Defendant Biehn took an appeal, it was granted and Defendant Biehn was allowed to enter the police academy. *(See Exhibit 37-2; John Biehn Appeal to Bridgeport Civil Service Commission).*

The Regulations of the Police Officer Standards and Training Counsel lists Entry Requirements for police officers in Connecticut. Specifically, section 7-294e-16 entitled Entry Level Requirements states in relevant part,

> "(h) Criminal Convictions: The Police officer Standards and Training Counsel requires, as a condition of appointment to the position of probationary candidate in a law enforcement unit in the state of Connecticut, . . . that a candidate has no criminal record revealing any conviction, under federal or state law . . . of any Class A or B misdemeanor." *(See Exhibit 38; The Regulations of the Police Officer Standards and Training Counsel section 7-294e-16 (h).*

The record reflects at the time of appointment, the Defendant Biehn was convicted of a Breach of Peace, a class B misdemeanor, which was disposed of

26

by way of a $35.00 fine.  *(See Exhibit 37; John Biehn Record, pg. 2).*  This would, of necessity, preclude his employment*. (See Exhibit 38).* There is no evidence that the Bridgeport Police Department had done any research to determine whether this was or was not a conviction.

"The existence of a criminal history may be the most significant critical indicator of a police candidate's propensity towards dishonesty and violence. <u>*The New York City Commission to Combat Police Corruption,*</u> *"Performance Study: A Review of The New York City Police Department's Background Investigation Process for The Hiring of Police Officers," January 1999, pg. 50).* (See Exhibit 38-1 Expert witness report / Affidavit). In fact, the minutes from the appeal hearing actually reflect that the City of Bridgeport routinely *grants* the appeals of persons with a history of dishonesty, violence and alcohol problems. *(See Exhibit 37-2; Appeal to Civil Service Commission, Reason for Disapproval Section).*   For instance, during that same appeal hearing, Officers Sherback, Whaeler, Geremia, Parker and Biehn were originally denied in part due to arrests for DWI, and Abuse of Alcohol and drugs; nevertheless, their appeals were granted.  The same minutes reflect that Bridgeport Police Officer Applicants are also routinely granted appeals when they have admitted acts of dishonesty against their employers.  For instance, Officers Koetsch, Lariccia, O'Brien, Sherback, Geremia, and Parker admitted to, Theft From Employer, Forgery, Abuse of Sick Time, and Fraud in Unemployment Compensation, yet their appeals were also granted.  Other items which appear to allow for routine grants of appeals

include, Lying on a Polygraph; Illegal Gambling During the Application Process; Arrest History, Inappropriate Public Behavior, Domestic Violence, and Drug Use. *(See Exhibit 37-2; Appeal to Civil Service Commission, Reason for Disapproval Section).*

In November 2001, Defendant Biehn was involved in a hostage situation in November of 2001, where he admitted to firing his weapon several times, and two perpetrators were killed, and three hostages were wounded by ricochets. *(See Exhibit 39; Biehn Deposition - pgs. 43 to 47), (Exhibit 40; Biehn Awards Ceremony Announcement pg. 3).* The award notice stated: "Desiring no further loss of life, officers ceased fire, surrounded the perimeter, and ordered the suspects to come out.  After a standoff, the suspects dropped their weapons and surrendered." (Emphases Added), *(See Exhibit 40; Biehn Awards Ceremony Announcement pg. 3).*  It appears that police recklessly began firing prior to an attempt to surround the perimeter and order the suspects to come out.

Immediately after the incident in August 22, 2004, Defendant Biehn was found at a Dunkin' Donuts right outside Marina Village, noticeably intoxicated, with his police badge and police identification on his person, matching the description of the assailant several people described in their calls to 911, but was not arrested for at least 30 days.  *(See Exhibit 41, First Warrant).*

When Defendant Biehn was arrested, he was only charged with misdemeanors, the warrant only mentioning that there were "shots fired," even though it was obvious by the 911 calls that Defendant Biehn was shooting at

28

people; shell casings were later determined matched his off duty weapon were located at the scene.  His police badge and identification were on his person and his weapon and his cell phone were found discarded in the Marina Village Complex.  *(See Exhibit 41)*.  The Police Chief at the time, Chief Chapman, recommended that Biehn lose 12 holidays as punishment for the incident.  *(See Exhibit 41-1; Chief Chapman's First Recommendation)*.  He was not placed on modified duty or suspension until November 2004 when his charges were enhanced to serious felonies. *(See Exhibit 42, Assignment Record)*.  It was not until November of 2004, after this Office became involved with the Plaintiffs, that Defendant Biehn was charged with Felonies, including four counts of Attempted Murder. Chief Chapman then finally recommended termination.  *(See Exhibit 41-2; Chief Chapman's Second Recommendation)*.

During Defendant Biehn's criminal trial, and while the jury was deliberating, it was announced in the newspaper that Defendant Biehn was given another two awards from the Bridgeport Police Department.  *(See Exhibit 41-2)*.  This, in light of the timing of the announcement, the ultimate verdict and the fact that the jury would not comment on it, one could infer that the City was attempting to tamper with the jury.

Officers were ordered to do gunshot residue testing on Biehn which tests were never examined by a lab.  *(See Exhibit 43; Lt. Evans Report to Chief)*.

Between 2003 and 2008, several Bridgeport Police Officers, detectives and even one Chief of Police have had one or more of the following: complaints filed

against them to internal affairs, arrested, and / or sued for misconduct: including at least two of the above named officers who's appeals were granted.  (*See Exhibits 44 to 44-10* ).

In 2003, Angel Ojeda and Mark Belinki were suspended for beating a suspect with their hands and their flashlights while a K-9 was attacking him.  No criminal charges were ever filed. *(See Exhibit 44-8)*.

In August 2004, off duty police officer Kim Nikola was arrested after attacking a woman at a Bluefish game. *(See Exhibit 44-9, and Exhibit 44-7)*.

In August 2004, Defendant Biehn was arrested.  *(See Exhibit 44)*. During or before jury deliberations in the Defendant Biehn's criminal trial, he was awarded two awards by the Bridgeport Police Department which was announced in the newspaper; he was thereafter acquitted of the most serious charges.  *(See Exhibit 44)*.

In 2004, the City was sued again in Tshidiadia v. City of Bridgeport, 3:06 CV 1746 (MRK).  There, some of the members of the Bridgeport Tactical Narcotics Unit, Namely Officers Raymond Long and Rosado, *inter alia*, in the midst of a buy-n-bust operation, pursued a suspect car.  The Plaintiffs alleged that the officers approached them without lights and sirens and did not  identify themselves. The Plaintiffs also alleged that the officers made fun of one of the woman for urinating on herself, refused to let the females clean the glass out of their clothing, and beat the male plaintiff.  The officers learned that they arrested the wrong parties. The case settled after jury selection, though no officer was disciplined and the

City admitted no wrong. (EXHIBIT 48).

In 2004, Officers Raymond Long and Rosado again allegedly, *inter alia*, beat a suspect with their flashlight and or pistol until they fractured his scull, and then allegedly lied to the police department and the hospital staff about how the suspect was injured.  No officer, including the one who admitted he injured the plaintiff were competent to testify either because they did not witness the incident or the officer claimed he had no independent recollection of injuring the plaintiff.  (See Exhibit 45 -  Colin Young Motion for Summary Judgement). The Plaintiff is now suing in Colin Young v. Bridgeport, CV NO. 3:08 CV 501 (AWT). No disciplinary action was taken.

The same year Officers Rosado and Long were sued again in Ocasio v. Rosado, et al., for excessive force in injuring the suspect in the head with a pistol and the case settled for an unknown amount before trial. Still, no disciplinary action was taken. (See Exhibit 48).

In May of 2005, Officer Jason Alterio, only four years on the job, was arrested for assaulting a woman, Delores Fonesca, wife of a Norwalk Police Officer, Ralph Fonesca, in the head with a flashlight, as well as banged her head into a door, punched her while yelling racial epithets, and charges Ms. Fonesca with assault on a police officer.  He was also arrested in Stamford for stalking an ex-girlfriend for months.  His time with the police department also included a host of other complaints women had made against him for assault.  (*See Exhibit 44-6*).

In 2007, Chief Brian Norwood told the Connecticut Post, "*it's clear to me the Board of Police Commissioners is not prepared to make decisions which will positively affect the demeanor and discipline of the officers of the City of Bridgeport,*" after the Board suspended Bridgeport Officer Douglas Bepko for seven months without pay.  The Board quipped that records for discipline for similar incidents over the last 10 years showed that "*termination would exceed prior known levels of discipline.*"  In addition, the Board noted that in recent years, only one officer was terminated and it was for a series of domestic violence arrests.  (*See Exhibit 44-10).*

In 2005, Chief Anthony S. Armeno of the Bridgeport Police Department lost vacation pay for assaulting a fellow female officer several times.  No criminal charges were ever filed.  *(See Exhibit 44-3).*

In 2006, the Office of Internal Affairs found that Officers Douglas Bepko, David Ulliano, Bruno Rodriguez, and Sgt. Christopher Stepniewski had violated departmental policies for excessive force in making an arrest, when, in 2004 they pistol whipped a resident in the head at his place of employment.  Nevertheless, the Board of Police Commissioners acquitted them, in spite of the Chief's recommendation of termination. This was the second time Officer Douglas Bepko was cleared by the Board after the Office of Internal Affairs sustained a citizen complaint.  He had also been the subject of several other citizen complaints and arrested in November 2006 for an assault on his then girlfriend, which was the subject of another investigation. *(See Exhibit 44-9, and Exhibit 44-10).*

32

In 2006, Bridgeport Officer Paul Humphrey was arrested for choking an arrestee in the State Police Barracks booking area.  He was later arrested for the altercation.  *(See Exhibit 44-5).*

## II.    ARGUMENT

### STANDARD OF LAW FOR SUMMARY JUDGMENT

A Motion for Summary Judgment will be granted where there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. American Int'l Group, Inc. v. London American Int'l Corp., 664 F.2d 348, 351 (2nd Cir. 1981). To survive summary judgment, the non-moving party must identify specific evidence that shows a genuine issue of material fact, not simply any factual dispute. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Paragon Podiatry Laboratory Inc., 984 F.2d 182, 1184-85 (2nd Cir. 1993). Rule 56(c) "provides that the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there is not a genuine issue of material fact."

In opposing a motion for summary judgment, the adverse party may not rest upon mere allegations or denial of pleading, but must "set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e), D'Amico v. City of New York, 132 F.3d 145, 149 (2nd Cir. 1998). The mere verification by affidavit of one's

own conclusory allegations is not sufficient to oppose a motion for summary judgment. Zigmund v. Foster, 106 F. Supp. 2d 352, 356 (D. Conn. 2000). Furthermore, the mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient [to avoid the entry of judgment against the non-moving party, there must be evidence on which the jury could reasonably find for the non-moving party. Anderson v. Liberty, Inc., 477 U.S. 242, 248 (1986).

The City of Bridgeport, through its Mayor, is responsible for supervision of the Bridgeport Police Department and investigate any misconduct.  *(Exhibit 46 - City of Bridgeport Municipal Reg. 2.08.010).*

Generally speaking, a municipality may not be held responsible under a theory of *respondeat superior* for the actions of its officers, even if said officers actions in violating citizens' constitutional rights were committed under the "color of law."  Monell v. City of New York, 436 U.S. 658, 691 (1978).  However, when a Plaintiff alleges that the municipality itself, had a custom, policy or practice, written or unwritten, that caused its officers or employees to violate the constitutional rights of citizens, it may be held responsible.  Monell v. City of New York, 436 U.S. 658, 691 (1978).

In *Monell*, the Plaintiffs alleged that the City had a policy, custom or practice of forcing women to take an unpaid leave of absence from work when it was not medically necessary. Monell v. City of New York, 436 U.S. 658, 661 (1978). The Court held that the City was a "person" under the federal constitution, and therefore, could be sued individually for violations of citizens' civil rights when it

34

had a custom, policy or practice of causing its employees to violate said rights. Monell v. City of New York, 436 U.S. 658, 691 (1978).

The elements in which the Plaintiffs have to prove in order to overcome a motion for summary judgment are as follows: 1) the existence of a municipal custom, policy, or practice, written or unwritten, and second, that there is a casual link between the custom or policy and the violation alleged. City of Canton v. Harris, 489 U.S. 378, 85 (1989). However, in order to demonstrate "a casual link between the custom, practice or policy and the violation alleged," a plaintiff does not have to show that the municipalities custom, policy or practice would result in the particular injury alleged, just the general nature of the injury. ( i.e., not specifically a shooting incident, but generally, an incident involving alcohol and / or abuse of power). Lubelfield v. City of New York, 4 N.Y.2d 455, 460-61 (1958).

In addition, if a plaintiff claims that he can identify any pattern of injuries linked to a municipality's hiring practices or that its hiring practices are generally defective to show that there is a casual link between the policy and the injury. See, Brown v. Bryan County, Oklahoma, 520 U.S. 397 at 408. It should be noted that the Second Circuit has found in at least one case that in some circumstance, *one singular act or failure to act may be enough to establish liability only if the violation which establishes a policy, practice or custom is committed by a policy maker or supervisor, not just an employee.* Riccuity v. New York City Transit Authority, 941 F.2d 119, 23 (2nd. Cir. 1993), Brown v. Bryan County, Oklahoma, 520

U.S. 397 at 408. and <u>Sarus v. Rotundo</u>, 831 F.2d 397, 401, 02 (2nd Cir 1987).

(Emphases added).

In <u>City of Canton, Ohio v. Harris</u>, 489 US 378 (1989), the court left open the question of whether a pattern of constitutional violations was requisite to 1983 claims in certain circumstances where a violation of civil rights was highly a predictable consequence of the failure to train officers and equip them with tools to handle particular situations. <u>Riccuity v. New York City Transit Authority,</u> 941 F.2d 119, 23 (2nd. Cir. 1993), and <u>Sarus v. Rotundo</u>, 831 F.2d 397, 401-02 (2nd Cir 1987).

<u>III.</u>

<u>CONCLUSION AS TO OFFICER BATISTA AND OFFICER TOBIN</u>

There is sufficient evidence, circumstantial, testimonial, and documentary to prove that Officer Batista used excessive force when he shot at the Plaintiff without provocation, and while the plaintiff was running away.  There is also sufficient evidence for a jury to find that Officer Batista used excessive force, intentional, reckless or grossly negligent, when he shot the Plaintiff in the head, and caused his death.

There is sufficient evidence that Officer Tobin, among other officers, were complicity to suppress or cover up the circumstances of the death of Raylyn George.  Therefore, Summary Judgment should not enter for the Defednants.

## IV.

### CONCLUSION MONELL

Here, the exhibits attached hereto prove that the City of Bridgeport has a long history, (dating from 1985), of a custom, policy or practice of allowing it's officers to use excessive force against citizens for plaintiff to show a casual link between the injures incurred in this instance and those continuous violations in the past; that is, a willful failure to investigate and discipline It's officrs when appropriate, shows an aquiesence of the City to allow It's officers to use excessive force without any repercussions – sometimes promotions.  Therefore, since there are material issues of fact for a jury to determine that the City of Bridgeport has a custom, policy or practice of failing to train, supervise, investigate and discipline It's officers, Summary Judgment should not enter for the Defendant.

RESPECTFULLY SUBMITTED

//s//Tina Sypek D'Amato//s//
Tina Sypek D'Amato, Esq.
The Law Office of
Tina Sypek D'Amato, LLC
135 Elm Street; Bridgeport, CT 06604
P:(203)336-2626; F(203)549-0771
Federal Bar # 26252

## CERTIFICATION

This is to certify that on the above date, the foregoing has been filed electronically and served by mail to anyone not able to receive electronic filing. Notice of this filing will be sent via the Court's e-filing system or by mail to anyone unable to receive e-filing as indicated on the notice of Electronic Filing. Parties may access this filing via the Court's CM/ECF System.

**//s//Tina Sypek D'Amato//s//**
**Tina Sypek D'Amato, Esq.**