Exhibit 22

1           UNITED STATES DISTRICT COURT

2             DISTRICT OF CONNECTICUT

3

4   - - - - - - - - - - - - - x
     THE ESTATE OF RAYLYN GEORGE, :
5         Plaintiff,     :
                       :
6          vs.         :
                       :
7    BRIDGEPORT POLICE OFFICERS  :
     LUIS BATISTA, HUGE TOBIN,   :      June 29, 2009
8    AND JOHN DOE 1, JOHN DOE 2, :
     (IN THEIR OFFICIAL AND    :
9    INDIVIDUAL CAPACITIES) AND  :
     CITY OF BRIDGEPORT,      :
10         Defendants.   :
    - - - - - - - - - - - - - x
11

12

13        DEPOSITION OF CHRISTOPHER MARTIN

14

15

16     Taken before Ellen S. Walsh, LSR #162, Court
     Reporter and Notary Public within and for the
17    State of Connecticut, pursuant to Notice and
     the Connecticut Practice Book, at the offices
18    of Tina Sypek D'Amato, 135 Elm Street,
     Bridgeport, Connecticut, on Monday, June 29,
19    2009, commencing at 4:51 p.m.

20

21

22        COMPUTER REPORTING SERVICE, LLC
         Licensed Shorthand Reporters
23          1 Grandview Terrace
         North Haven, CT 06473-2043
24           (203)234-1144

APPEARANCES:

For the Plaintiff:

TINA SYPEK D'AMATO, ESQ.
135 Elm Street
Bridgeport, Connecticut 06604

For the Defendants:

NOBLE, SPECTOR & O'CONNOR, P.C.
One Congress Street
Hartford, Connecticut 06114-1067
            By:  ELLIOT B. SPECTOR, ESQ.

1  believe he was on Columbia.

2      Q    Okay.  So you got out of your vehicle?

3      A    Yes.

4      Q    And you started walking down Park Terrace?

5      A    Yes.

6      Q    And on the right-hand side, you heard some

7  kind of shots?

8      A    To my right I heard shots.

9      Q    And that's 103-105 Park Terrace,

10 approximately?

11     A    I guess so.  I don't know.

12     Q    About three houses down?

13     A    Two or three houses up, yeah.

14     Q    All right.  And as a result, you wanted to

15 take cover?

16     A    I did.

17     Q    So you got behind your vehicle?

18     A    I ran to Speranza's vehicle, Blue 12, and

19 retrieved a shotgun right out of that car.

20     Q    So you got a shotgun from Officer Speranza's

21 vehicle?

22     A    Yes.

23     Q    And then you ducked behind --

24     A    I got -- I went behind my car.

COMPUTER REPORTING SERVICE

1      Q    Behind your car?

2      A    Blue 13, both marked police vehicles.

3      Q    Okay.  And at some point you started walking

4 back up Park Terrace?

5      A    I did.

6      Q    And then you --

7      A    Taking -- what's the correct terminology?

8 Concealment and cover.

9               MR. SPECTOR:  Concealment and

10          cover.

11 BY MS. D'AMATO:

12      Q    Okay.  So you were covering yourself?

13      A    No.  Just -- I was walking at a --

14 concealment meaning I was going very slow and low with

15 the shotgun.

16      Q    Okay.  And why were you going in that

17 direction?

18      A    Because that's where the bad guy was.

19 That's what we're trained to do.

20      Q    Okay.  So you knew somebody was over there?

21      A    Yes.

22      Q    You weren't sure who shot those shots,

23 though, right?

24      A    No.

1    Q    And you were chasing a bad guy.  Do you know
2  where he was?

3    A    Well, there were shots coming near the
4  houses, so I guess it was right around there.

5    Q    Did you ever make it to that house?

6    A    No.

7    Q    And you heard over the radio some
8  instructions to go to Gregory Street?

9    A    I'm just trying to remember.  There was some
10  radio traffic.  There was a lot of radio traffic,
11  people stepping on each other.  I continued down south
12  towards -- on Columbia.

13    Q    And on the corner of Park and Columbia,
14  there's a big, empty, overgrown lot?

15    A    Yes.

16    Q    And so you're -- you walked --

17    A    Walking south.

18    Q    -- down Park Terrace towards Columbia
19  Street?

20    A    I never actually physically made it onto
21  Park Terrace, I believe.  I just continued south
22  towards Columbia.

23    Q    Okay.  So you were going south towards
24  Columbia from Park Terrace?  You were going towards

1    Gregory Street, which is parallel?

2         A    Yeah.  I was probably like 10 feet -- I mean

3    10 yards from my car at an angle.

4         Q    So you were still on the corner?

5         A    Yes, on the corner.

6         Q    Now, you said that when you were on Columbia

7    Street, you looked to your left and you could see

8    Officer Batista in the backyard?

9         A    I did.  Behind the house.

10        Q    What did you see in the backyard?

11        A    I saw him standing there alone.

12        Q    Alone.  Okay.  And did you see the suspect

13   at all?

14        A    No.

15        Q    And did you stay there or did you just

16   go straight -- did you stay and look at

17   Officer Batista and wait for something or did you just

18   go to Columbia Street -- I mean Gregory Street?

19        A    I began walking, toward turned to my left,

20   and saw Officer Batista.  I might have turned towards

21   him, and I came back.  I believe the radio traffic

22   picked up again that there was another suspect being

23   chased or something.

24        Q    Now, when you arrived at Columbia and Park

COMPUTER REPORTING SERVICE

# Exhibit 23

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| THE ESTATE OF RAYLYN GEORGE,<br>    Plaintiff, | : | |
| | : | |
| v. | : | 3:08cv1023 (VLB) |
| | : | |
| BRIDGEPORT POLICE OFFICERS, LUIS | : | |
| BATISTA, HUGE TOBIN and JOHN DOE 1, | : | |
| JOHN DOE 2 and CITY OF BRIDGEPORT, | : | SEPTEMBER 16, 2009 |
|     Defendants. | | |

## DEFENDANT CITY OF BRIDGEPORT'S RESPONSES TO PLAINTIFF'S REQUEST FOR ADMISSIONS TO CITY OF BRIDGEPORT DATED 8/25/09

1    At all relevant times, the individual Defendants acted toward Plaintiff in accordance with the training and supervision received by the Bridgeport Police Department.

**ANSWER:    ADMIT.**

2.    At all relevant times, the individual Defendants acted toward the Plaintiff in accordance with a custom, policy or practice of the Bridgeport Police Department.

**ANSWER:    ADMIT.**

3.    At all relevant times, all officers, supervisors and or detectives involved in this incident, both in uniform and in plain clothes, acted toward Plaintiff in accordance with the training and supervision received by the Bridgeport Police Department.

**ANSWER:    ADMIT.**

4.    At all relevant times, all officers, supervisors and or detectives involved in this incident, both in uniform and in plain clothes, acted toward the Plaintiff in accordance with a custom, policy or practice of the Bridgeport Police Department.

**ANSWER:    ADMIT.**

5.    Defendants were not disciplined as a result of their actions during the above named incident.

**ANSWER:    ADMIT.**

6.      No officer, supervisor or detective, in plain clothes or uniform, present at the scene were disciplined for their actions during this incident.

**ANSWER:    ADMIT.**

                                                DEFENDANT: City of Bridgeport


                                    By:    _____
                                                Elliot B. Spector
                                                Federal Bar #ct05278
                                                Noble, Spector & O'Connor, PC
                                                One Congress Street
                                                Hartford, CT  06114
                                                860-525-9975
                                                Fax: 860-727-9915
                                                spector@nsyolaw.com

# Exhibit 24

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| 2 | DISTRICT OF CONNECTICUT |

```
 3

 4    - - - - - - - - - - - - x
      THE ESTATE OF RAYLYN GEORGE,:
 5              Plaintiff,         :
                                   :
 6              vs.                :
                                   :
 7    BRIDGEPORT POLICE OFFICERS   :
      LUIS BATISTA, HUGE TOBIN,    :    June 29, 2009
 8    AND JOHN DOE 1, JOHN DOE 2,  :
      (IN THEIR OFFICIAL AND       :
 9    INDIVIDUAL CAPACITIES) AND   :
      CITY OF BRIDGEPORT,          :
10              Defendants.        :
      - - - - - - - - - - - - - x
11

12

13                DEPOSITION OF SEAN RONAN

14

15

16         Taken before Ellen S. Walsh, LSR #162, Court
           Reporter and Notary Public within and for the
17         State of Connecticut, pursuant to Notice and
           the Connecticut Practice Book, at the offices
18         of Tina Sypek D'Amato, 135 Elm Street,
           Bridgeport, Connecticut, on Monday, June 29,
19         2009, commencing at 3:16 p.m.

20

21

22              COMPUTER REPORTING SERVICE, LLC
                  Licensed Shorthand Reporters
23                    1 Grandview Terrace
                   North Haven, CT 06473-2043
24                      (203)234-1144
```

1     regarding a police-related shooting and the

2     limitations of police officers?

3         A     I don't understand the question.

4         Q     Everybody says that. I don't know. Is it

5     a --

6         A     I don't.

7         Q     That's okay.

8                MR. SPECTOR: I don't either.

9     BY MR. SPECTOR:

10        Q     Are there any limitations for Bridgeport

11    police officers when one of their own is suspected in

12    a shooting?

13              MR. SPECTOR: I will object to

14            that.

15        A     I don't believe so. I'm not sure, ma'am.

16    BY MS. D'AMATO:

17        Q     You believe so?

18        A     Yeah. No, I don't believe so.

19        Q     You don't believe?

20        A     No limitations as inasmuch as -- can you

21    expound on that?

22        Q     Sure. Are officers in the Bridgeport Police

23    Department limited to, say, cordoning off the scene or

24    speaking to witnesses after one of their colleagues

1  has been suspected of shooting another person, a

2  suspect?

3      A    I think if a police officer is approached by

4  a witness, they would have to, you know, provide that

5  information to the investigators.

6      Q    Okay.  Okay.  I guess my question is, do you

7  think it's appropriate that you drove Officer Batista

8  to his house after he was involved in a police-related

9  shooting?

10     A    Sure.

11     Q    If you knew that he was a suspect in a fatal

12 shooting, do you think it was appropriate for you to

13 drive him to his house?

14     A    Sure.

15     Q    And if you knew that he was a suspect in a

16 fatal shooting, would you think it's appropriate for

17 you to go to collect his evidence?

18     A    Yes.

19     Q    Do you think that when a -- what do you

20 think the purpose is for the state police coming to

21 the scene and investigating?  What do you think the

22 purpose is of that?

23     A    To have an outside agency investigate the

24 act.

1     Q     Okay. And how come?

2     A     For impartiality.

3     Q     So when you say impartiality, you're saying

4 that the Connecticut State Police would be impartial

5 to whatever happened at the scene?

6     A     Yes.

7     Q     And that maybe Bridgeport police officers

8 would not be so impartial?

9     A     I think there's a concurrent investigation

10 that runs through our detective bureau also, in our

11 internal affairs, through internal affairs.

12     Q     Okay. But internal affairs is not regulated

13 by the chief of police or the Bridgeport Police

14 Department?

15     A     Yes and no. That's something for another

16 day, I guess. No. They come under the special master

17 in New Haven and the board of police commissioners.

18     Q     Yes.

19     A     So they conduct an investigation also.

20     Q     Right. But they don't answer to the chief,

21 they don't answer to --

22     A     Technically, I guess they kind of do answer

23 still to the chief because the chief can order an

24 investigation. And that's what I mean, that's a

COMPUTER REPORTING SERVICE

```
 1   battle for another day, I think.

 2        Q    Okay.  But there's a reason why the -- you

 3   said that the state police arrive on scene so that

 4   there's impartiality?

 5        A    Yes.

 6        Q    And you were a member of T.N.T.?

 7        A    Yes, ma'am.

 8        Q    A colleague of Officer Batista?

 9        A    Yes.

10        Q    You worked with him sometimes?

11        A    Yes.

12        Q    And do you think that -- and I'm not talking

13   about you personally.

14        A    Okay.

15        Q    But do you think that a colleague of a

16   police officer would be less partial than the state

17   police, for instance --

18                  MR. SPECTOR:  Object to the form.

19   BY MS. D'AMATO:

20        Q    -- would be more partial?

21        A    No.  I think we're sworn to uphold, you

22   know, the law, so that's what we have to do.  You have

23   to remove yourself from it and be impartial.

24        Q    Okay.  And do you think that all Bridgeport
```

COMPUTER REPORTING SERVICE

```
1   police officers are impartial?

2        A    I'd like to think we are.

3        Q    But do you think you are?

4        A    I know I am.  I can only speak for myself,

5   so ....

6        Q    Do you think that police officers are more

7   honest than other people?

8        A    I know I am.
```

1    police officers are impartial?

2         A    I'd like to think we are.

3         Q    But do you think you are?

4         A    I know I am.  I can only speak for myself,

5    so ....

6         Q    Do you think that police officers are more

7    honest than other people?

8         A    I know I am.

9         Q    But do you think police officers in general,

10   because they wear a badge and a gun, are more honest

11   than other people?

12        A    Yes.

13        Q    And why?

14        A    Because I'm a police officer.

15        Q    Okay.  Do you think it was appropriate for

16   Officer Batista or do you think it would be

17   appropriate if Officer Batista washed his hands after

18   a police-related shooting where he was a suspect?

19        A    I'm not sure.

20        Q    Why?

21        A    I don't know all the investigative

22   scientific stuff, but I know it shows GSR, and he's

23   never denied firing his gun, so there's GSR.  And, you

24   know -- I mean, he said it himself, that he shot his

Exhibit 25

1          UNITED STATES DISTRICT COURT

2            DISTRICT OF CONNECTICUT

3

4   - - - - - - - - - - - - - x
     THE ESTATE OF RAYLYN GEORGE, :

5        Plaintiff,    :
                      :

6         vs.        :
                      :

7    BRIDGEPORT POLICE OFFICERS  :
     LUIS BATISTA, HUGE TOBIN,  :      June 29, 2009

8    AND JOHN DOE 1, JOHN DOE 2, :
     (IN THEIR OFFICIAL AND    :

9    INDIVIDUAL CAPACITIES) AND  :
     CITY OF BRIDGEPORT,     :

10        Defendants.   :
   - - - - - - - - - - - - - - x

11

12

13       DEPOSITION OF LEONARD SAMATULSKI

14

15

16      Taken before Ellen S. Walsh, LSR #162, Court
     Reporter and Notary Public within and for the

17   State of Connecticut, pursuant to Notice and
     the Connecticut Practice Book, at the offices

18   of Tina Sypek D'Amato, 135 Elm Street,
     Bridgeport, Connecticut, on Monday, June 29,

19   2009, commencing at 2:36 p.m.

20

21

22        COMPUTER REPORTING SERVICE, LLC
        Licensed Shorthand Reporters

23          1 Grandview Terrace
         North Haven, CT 06473-2043

24           (203) 234-1144

1    don't -- do you think that that would violate this

2    protocol?

3        A    No.

4        Q    Okay.  Do you think it would violate the

5    protocol for the suspect officer to wash his hands

6    before he was tested for gunshot residue?

7        A    To what?

8        Q    To wash his hands.

9        A    Protocol or -- you lost me on that one again

10   too.

11       Q    If a police officer is suspected of shooting

12   someone and there's a fatality as a result, do you

13   think it's appropriate that he wash his hands before

14   he's tested for gunshot residue?

15       A    Do I think it's appropriate?  No, I don't.

16       Q    Okay.  And again, looking at this protocol,

17   just one more question:  Do you think it's appropriate

18   that the suspect officer and his friend that works in

19   the same department as he collect his evidence for him

20   and bring them to the headquarters where the state

21   police are located?

22            MR. SPECTOR:  Objection.  Asked and

23            answered.

24       A    I don't think that's inappropriate.

COMPUTER REPORTING SERVICE

BY MS. D'AMATO:

    Q    You don't?

    A    No, I don't.

    Q    And again, you don't think that affects the integrity of the investigation?

    A    No, I don't.

    Q    Because police officers are more credible than other people?

    A    Yes, that's correct.

        MS. D'AMATO:  No further questions.

    Mr. Spector?

        MR. SPECTOR:  No questions.

        (Deposition concluded:  2:55 p.m.)

COMPUTER REPORTING SERVICE

# Exhibit 26

# News

# Paper Trial

## The curious emergence of documents relating to the death of Bridgeport youth Raylyn George

### By Lorraine Gengo

fter six months of assurances that the city had no documents concerning the shooting death of a black Bridgeport youth that may or may not have involved a city cop, and after seeking to censure the attorney who had petitioned under the Freedom of Information Act for said documents, Bridgeport associate city attorney Melanie J. Howlett last Monday produced 21 pages of paperwork relating to the Aug. 25, 2005 shooting.

Howlett located the documents in the archives of the West Side precinct just in time to meet the Feb. 12 deadline set by the state's Freedom of Information Commission. At the commission hearing on Jan. 18, Howlett testified that the city had no documents related to the shooting of Raylyn George—a point she stressed repeatedly—because the Connecticut state police, and not the Bridgeport P.D. conducted the investigation. "We do not keep a duplicate file and the breadth of the investigation was within their department," Howlett told hearing officer Mary E. Schwind.

When asked why she was sud-

tailing that crack cocaine was confiscated at the scene, and two injury reports related to police officers.

To recap: On Aug. 25, 2005, the Bridgeport police Tactical Narcotics Team (TNT) received a tip that seven young men armed with guns had congregated at Marina Village, a housing project in Bridgeport's South End. TNT officer Louis Batista chased one of them, Raylyn George, through the streets and backyards of the neighborhood, according to the officers' reports that Howlett released last week. Batista fired several shots at George, who, according to police witnesses, was armed. One police witness said he heard Batista scream out, "Drop the weapon. Drop it now!" before pursuing George behind a house—where George died.

After the state police and the state Department of Public Safety conducted their investigation, the state's

and above his ear and exited "above his left eye and just under the hairline."

The person most likely to have witnessed the truth about how Raylyn George died—whether it was an accident, or a suicide as the state's attorney's report implied, or by some other means—is officer Louis Batista.

But Batista's account of what happened on Aug. 25, 2005 is not part of the public record, nor is it known who has the reports he presumably filed on or shortly after that day.

Attorney Weinstein alleges that Bridgeport police covered up the shooting by allowing Batista to leave the scene in order to clean gunshot residue from his hands. Weinstein charges that the residue might have shown that Batista shot George with his own gun. Batista's hands tested negative for gunshot residue, according to the state's attorney's report, a curious result given the fact that he admitted to firing his weapon several times during the chase.

Weinstein's dogged persistence to obtain information from the

### "My opinion is not important. The questions need to be asked of the state police, not the Bridgeport police."

[illegible] able to locate documents that prior to the commission hearing she had emphatically insisted did not exist, Howlett abruptly replied: "That's a pending matter. There's no way you'll get a comment out of me. Have a nice day."

The 21 pages Howlett faxed to Bridgeport attorneys Burton Weinstein and Tina Sypek, who represent George's relatives, were all forwarded to the state police in 2005, according to Howlett's cover letter to the attorneys. The documents include reports from several police officers who responded to the scene, but didn't witness the shooting of George, as well as incident reports de-

[illegible] police, not the Bridgeport police.

attorney's office issued a report exonerating Batista, stating that "no peace officer fired a weapon that caused any injury to Raylyn George."

Without explaining how, the state concluded that George shot himself twice from behind while attempting to scale a four-foot-high fence. According to the chief medical examiner's report, George had two "through and through gunshot wounds." The first entered his right thigh and exited through his knee cap; the fatal wound was to the right side of his head, behind

Documents retained by the Bridgeport police concerning the shooting death of Raylyn George

Bridgeport police department regarding the circumstances of George's death led city attorney Howlett to file a motion on Jan. 17 with the FOI Commission to have Weinstein censured for harassment for "inconveniencing the highest law enforcement official of the largest city... in the state."

That official would be Bridgeport police chief Bryan Norwood, who, when asked about whether he had knowledge of the recently released paperwork, said, "The whole thing predates me by about three years."

Norwood was not chief of police at the time George was shot, but given the controversy surrounding the case it would seem reasonable to assume that he would have apprised himself of the facts concerning George's death and his officers' possible involvement. According to Howlett's testimony at the FOI hearing, the city was not even aware of the state's attorney's report until Sept. 1, 2006—more than three months after it was posted on the state's website.

Asked whether the death by shooting of a young black man was an issue of concern to him, Norwood replied: "My opinion is not important. The questions need to be asked of the state police, not the Bridgeport police."

Meanwhile, given the sudden appearance of those 21 pages of documents, Weinstein says he is mulling a request for counsel's fees from the city attorney's office since Howlett put him and the commission through the "unnecessary trouble" of filing an FOI request. (He's working pro bono on the case itself.)

"Howlett was speaking in reckless disregard of the truth, but she never lies," Weinstein quipped.

"That's a subtle lawyer distinction."

lgango@fairfieldweekly.comw

Exhibit 27

Web  Images  Videos  Maps  News  Shopping  Gmail  more ▼                    Sign in

Google scholar                                    Search

| View this case | How cited | **Arroyo v. Walsh, 317 F. Supp. 869 - Dist. Court,** |

**317 F.Supp. 869 (1970)**

**Wilson Ruiz ARROYO, Plaintiff,**

v.

**Joseph A. WALSH et al., Defendants.**

Civ. A. No. 13100.

**United States District Court, D. Connecticut.**

July 8, 1970.

870     *870 Burton M. Weinstein, Saltman, Weiss, Weinstein & Elson, Bridgeport, Conn., for plaintiff.

Frank Edward Babycos, Bridgeport, Conn., for defendants.

## MEMORANDUM OPINION AND ORDER

LUMBARD, Chief Judge:[*]

Wilson Ruiz Arroyo brings suit under 42 U.S.C. §§ 1981, 1983, 1985, 1986 and 1988 against Anthony Vida, John Lorenzo, Anthony Tom, Donald Murray and Robert Moore, police officers of Bridgeport; the Mayor of Bridgeport, the Superintendent of Police and six police commissioners of the City, charging them with violation of his civil rights. More specifically he alleges that when he was arrested on the night of September 18, 1968, after driving at 45 miles per hour through a stop sign and colliding with another car, Officers Vida and Lorenzo beat him with their fists and with a stick, breaking his nose and causing severe pain and suffering.

On all the evidence I must conclude that Vida and Lorenzo used excessive force and I direct entry of judgment against them in the sum of $2,500. See Monroe v. Pape, 365 U.S. 167, 81 S. Ct. 473, 5 L.Ed.2d 492 (1961); Nesmith v. Alford, 318 F.2d 110 (5th Cir. 1963); Stringer v. Dilger, 313 F.2d 536 (10th Cir. 1963). As to the other defendants the complaint is dismissed. There has been no showing that the Mayor and the Police Superintendent improperly trained the police or acquiesced in the denial of Arroyo's civil rights. Nor does the complaint make sufficient allegation and showing to support the plaintiff's prayer, as a representative of Puerto Ricans in Bridgeport, that a receiver be appointed to process complaints regarding police treatment of Puerto Ricans. See Powell v. Workmen's Comp. Board, 327 F.2d 131 (2 Cir. 1964); Valley v. Maule, 297 F. Supp. 958 (D.Conn.1968).

It is now well established that local law enforcement officers who act under color of state law and who use excessive force in the enforcement of state laws are subject to civil liability under § 1983 as thereby they deprive those so injured of rights guaranteed by the Constitution and laws of the United States. See Monroe v. Pape, supra; Brazier v. Cherry, 293 F.2d 401 (5th Cir.), cert. denied, 368 U.S. 921, 82 S.Ct. 243, 7 L.Ed.2d 136 (1961); Hardwick v. Hurley, 289 F.2d 529 (7th Cir. 1961); Coleman v. Johnston, 247 F.2d 273 (7th Cir. 1957), Davis v. Turner, 197 F.2d 847 (5th Cir. 1952); Downie v. Powers, 193 F.2d 760 (10th Cir. 1951).

871     The undisputed facts show that about 9:00 P.M. on the evening of September 18, 1968, Arroyo was driving east on Crescent Street at a speed of 45 m. p. h. in his Chevrolet car although he had no license to drive. He failed to slow down when he came to the stop sign at the intersection of Pembroke Street and collided with a car which had just entered the

intersection from Pembroke. Arroyo's car careened ahead at about 30 miles an hour until it came to a stop near a telephone pole 452 feet from the point of collision. Because of damage to the car, it could go no further. Vida and Lorenzo had been following Arroyo's car and when they drew up alongside they proceeded to arrest Arroyo. While the manner of Arroyo's leaving his car and *871 his conduct immediately thereafter is in dispute, it is agreed that Arroyo was subdued, handcuffed and placed in the rear seat of the police car. The police called for an ambulance and then returned to the scene of the collision. Arroyo was then placed in the ambulance and taken to the Bridgeport Hospital where he was x-rayed and the doctor in attendance found that Arroyo had a comminuted fracture of the nose, the bone having been shattered into many little sharp pieces, and five stitches were needed to close the wound.

The officers filed charges against Arroyo for resisting arrest, Conn.G.S. § 53-165; evading responsibility, Conn. G. S. § 14-224; running through a stop sign, Conn.G.S. § 14-301; driving without a license, Conn.G.S. § 14-36(a); and driving with faulty equipment, Conn. G.S. § 14-80. He was released on $450 bail sometime in the morning. Some months later, on February 13, 1969, apparently because the police or the city counsel failed to supply particulars in response to a motion made by Arroyo's attorney, the charges were dismissed. In view of Arroyo's admission that he was driving in excess of the speed limit, that he had no license to drive and that he failed to stop at the stop sign, the failure to supply particulars and prosecute the charges seems incomprehensible. Within a few days after the charges had been dismissed, Arroyo gave the City Clerk of Bridgeport a Notice of Intention to bring an action, and this action was commenced on April 23, 1969.

The testimony of Arroyo and that of a bystander, Johnny Garcia, differs sharply from that given by Vida and Lorenzo regarding Arroyo's treatment by the two police officers. Arroyo, who was 19 years old at the time of the accident, came to the United States from Puerto Rico in April 1967 and lived with his grandmother and his uncle in September 1968. He testified through an interpreter as it was apparent that his understanding of English was still somewhat limited at the time of trial in May 1970. Arroyo concedes that on the evening of September 18 he was driving about 45 m. p. h. on Crescent Street. As he came to the stop sign at the intersection of Pembroke Street he put his foot on the brake but the car did not stop; he then collided with James Brasiel's car in the middle of the intersection. Arroyo said he was not injured by the crash into Brasiel's car; he did not have the seat belt on, and the windshield was not broken. His car veered but kept going on Crescent Street until it came to a stop against a pole near the curb. At that point the car could no longer be driven.

Although he had no wounds and was not bleeding, Arroyo felt dizzy. The two policemen came alongside and took him out of the car. They beat him with their fists and broke his watch. They handcuffed his hands behind his back, took him by the hair and smashed his face against the glass of the back window of his car, and then put him in the police car. The driver of the car, whom Arroyo identified as Vida, hit him on the nose with a short club and said "I feel like killing you as though you were a dog." By this time Arroyo was bleeding from his face and nose. Almost immediately after he was taken back to the intersection an ambulance arrived and he was taken to the hospital where he was x-rayed and five stitches were taken in his nose.

Johnny Garcia, a disinterested bystander, supported Arroyo's account of his treatment by Vida and Lorenzo. Garcia, who was 16 at the time, also testified through an interpreter. He saw the cars hit and he then ran after Arroyo's car. Vida and Lorenzo were already there when he got to Arroyo's car which had stopped when it hit the pole. He testified that they got out of their car, opened the door of Arroyo's car and took him out "like a dog;" they beat him with their fists, kicked him many times, handcuffed him and threw him in the back of their car. One of the police said to him "I feel like killing you, you ____ing Puerto Rican" and swung at 872  him with something. Arroyo's face *872 "looked like a Roman candle" and he was "bleeding all over the place." After the police left with Arroyo, Garcia looked at Arroyo's car and saw no blood in the car. Garcia had not known Arroyo but someone at the scene told him where Arroyo lived and he went there and saw Arroyo's uncle whom he did know.

Lorenzo and Vida gave quite a different version of Arroyo's arrest. Lorenzo, who had been on the force for eleven months, testified that he was riding with Vida in a police car, just in back of Arroyo's car, at it went at 45 to 50 m. p. h. and failed to stop or slow down at the Crescent

Street stop sign. They saw the collision and followed Arroyo as his car came to a stop near the curb. Lorenzo got out, ran to Arroyo's car and asked him for his driver's license. Arroyo, who "was just sitting there," seemed dazed. Then Arroyo, who was bleeding, swung open the car door which hit Lorenzo in the chest, knocking him down. Arroyo tried to get away but Lorenzo and Vida subdued him, put him over the trunk of his car and handcuffed him. Arroyo's face was bleeding and there was blood on the windshield. They did not strike or kick Arroyo. They placed him on the back seat of the police car. Vida used the radio phone and asked for an ambulance and they drove back to the intersection where Lorenzo got into another police car and went to Bridgeport Hospital for treatment of a sprained ankle. In the casualty report made out on September 18, 1969 at 10:40 P.M. it was noted that Lorenzo "received injuries in the scuffle." Lorenzo said that the steering wheel of Arroyo's car looked "pushed up forward" and there was a cob-web like crack in his windshield. Lorenzo saw blood on the windshield and steering wheel. Lorenzo's accident report made no mention of these facts nor did he report Arroyo's injury.

Vida testified that he was driving the police car. Lorenzo was the first out of the police car, and as he approached Arroyo's car, Arroyo slammed the door into him and tried to get away. Lorenzo fell on his side, breaking his fall with his right hand injuring his knuckles and twisting his ankle. Vida is 6' 2", weighs 215 pounds, plays semi-pro football and is a weight lifter. Arroyo is slightly built and considerably shorter. Vida said that Arroyo ran into him and he used a bear hug to subdue Arroyo. Vida then put handcuffs on Arroyo. During the scuffle, Vida got blood on his hands but not on his clothes. Vida testified he did not see Arroyo strike any part of his body in the collision but he did see a break in Arroyo's windshield directly over the steering wheel which was bent; further he testified there was blood on the steering wheel and inside the windshield. Vida, like Lorenzo, made no mention of these factors in his report of September 18. Vida also testified that Lorenzo had a night stick but that he himself did not carry one.

Police officer Robert Moore who came to investigate said he remembered a hair line crack on the windshield of Arroyo's car, blood on the steering wheel and he thought there was some blood on the windshield. Sergeant Murray also remembered that Arroyo's windshield was cracked and shattered. No police record made at the time contained any reference to the condition of Arroyo's car. The first time the condition is reported is in the reports made in March and April 1969, by Vida and Lorenzo, at the request of Inspector Leahy and Captains Bergers and McPadden of the Bridgeport Police Department, after this suit had been brought.

From the demeanor of the witnesses and the evidence given, I credit the testimony of Arroyo and Garcia that Arroyo's nose was broken by a blow from Lorenzo's night stick wielded by Vida. It is quite understandable that Vida and Lorenzo thought they might have trouble subduing Arroyo who had just driven through a stop sign, collided with another car and proceeded ahead for 150 yards before stopping. Although the defense of good faith and probable cause is available to the defendants under 42 U.S.C. § 1983, Pierson v. Ray, 386
873   U.S. 547, 87 *873 S.Ct. 1213, 18 L.Ed.2d 288 (1967), I find their arguments unpersuasive on this record. It is hard to believe that Arroyo, in a dazed and shaken condition from the collision, could have tried to flee or resist two police officers. Indeed, if one credits the defendants' theory that Arroyo's nose was already broken as a result of the collision, the testimony of Vida and Lorenzo seems all the more unlikely. Moreover, it does not seem probable that Arroyo's nose was broken as a result of the collision with Brasiel's car as he showed no signs of any other face injuries when examined by the doctor. Whatever scuffle may have taken place and whatever resistance Arroyo may have offered, I must conclude that the officers used force well in excess of what was reasonably required. Moreover, there was no need to use any force once he was handcuffed and placed in the police car. The use of excessive force and the blow from the night stick, for all of which both Vida and Lorenzo must be held responsible, was a violation of Arroyo's civil rights.

Although counsel for Arroyo has requested that counsel fees be awarded, the court is not disposed to award counsel fees in a case which is essentially a simple tort action arising from a single incident affecting but one person. See Maier Brewing Co. v. Fleischmann Distilling Corp., 359 F.2d 156 (9th Cir. 1966), aff'd 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967); Williams v. Kimbrough, 295 F. Supp. 578 (D. La. 1969). Those cases which counsel

cites do not support his position as they are cases of long and continuous discrimination involving considerable numbers of people. The request for counsel fees is therefore denied.

In sum, I find that Arroyo has shown that his civil rights were violated by the unnecessary use of excessive force by Vida and Lorenzo, Monroe v. Pape, supra. Arroyo, who was earning approximately $165 per week, lost eight days of work as a direct result of the injuries sustained in the incident. He also paid a total of $12 in doctor bills for two visits to a doctor. As compensation for his lost wages, doctor bills and pain and suffering he should have judgment in the sum of $2,500. See Rhoades v. Horvat, 270 F.Supp. 307 (D.Colo.1967); McArthur v. Pennington, 253 F.Supp. 420 (E.D.Tenn.1963); Antelope v. George, 211 F.Supp. 657 (D.Idaho 1962).

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.

The Clerk is directed to enter judgment in favor of the plaintiff and against defendants Vida and Lorenzo, and dismissing the complaint as to all other defendants.

[*] Of the United States Court of Appeals for the Second Circuit, sitting by designation.