UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ESTATE OF RAYLN GEORGE,          :
    Plaintiff,          :
              :
v.          :          CIVIL ACTION NO.
              :          3:08-cv-1023 (VLB)
BRIDGEPORT POLICE OFFICERS          :
LUIS BATISTA, HUGH TOBIN and          :
JOHN DOE 1, JOHN DOE 2, AND          :
CITY OF BRIDGEPORT          :
    Defendants.          :          March 31, 2011

## MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. #30]

The Plaintiff, the Estate of Raylyn George (hereinafter "the Estate") initiated this action against Bridgeport Police Officers Luis Batista ("Batista") and Hugh Tobin ("Tobin"), in their official and individual capacities; the City of Bridgeport ("the City"); and two unidentified members of the Bridgeport Police Department, referred to as John Doe One, and John Doe Two, in their official and individual capacities. [Doc. #22]. The Estate alleges violation of the civil rights of Raylyn George ("George") pursuant to 42 U.S.C. §1983. Specifically, the Estate contends that Officers Tobin and Batista acted with gross negligence or with reckless disregard as to George's health, safety, and civil rights; and that the City had a custom, policy, or practice of failing to adequately train police officers in and disciplining them for violations of policies regarding the proper use of deadly force, as well as policies and procedures relating to investigation of officer-related shootings, including the requirements for gunshot residue testing of

officers involved in such shootings. The Estate claims that these customs, policies, and/or practices were the proximate cause of the George's death. [*Id.*]. The Estate also alleges that the Defendants engaged in a conspiracy to violate George's civil rights as prohibited by 42 U.S.C. § 1985, in that Defendants the City, Tobin, Batista, and John Does One and Two, "conspired and agreed to cover up the circumstances surrounding George's death because he was a black male." [*Id.*].

The Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure against the Estate. [Doc. #30]. The Defendants contend that Batista and Tobin's alleged conduct does not amount to a constitutional violation and even if it does, the Defendants, in their individual capacities, are entitled to qualified immunity. Further the Defendants assert that the claims against John Does One and Two should be dismissed as the Estate has failed to identify them by name within the relevant statute of limitations period. The Defendants contend that the claims against the City necessarily fail because the Estate is unable to prove that George's constitutional rights were violated, and because the Estate fails to establish municipal liability pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Lastly, the Defendants assert that summary judgment should be issued against the Estate as to the Section 1985 conspiracy claim because the Estate failed to produce evidence that any such conspiracy was motived by a racial or otherwise prohibited class-based animus. For the following reasons, the Defendants'

motion for summary judgment [Doc. #30] is granted as to the Section 1983 claims against Tobin, and as to the Section 1985 conspiracy claim against all Defendants, but denied as to the Section 1983 claims against Batista and the City.

<u>Factual and Procedural History</u>

The following facts are undisputed for the purpose of the Defendants' motion for summary judgment unless otherwise noted. At approximately 3:45 p.m. on or about August 25, 2005, Officer Keith Ruffin received information that several individuals with handguns were gathered in a location known as "Marina Village." At approximately 4:00 p.m., Batista and Officer Robert Simpson, with their guns drawn, approached a group of males and instructed them to get on the ground. Two of the males complied with the officers' orders, but George started to run. Batista testified that he pursued George, and that during that pursuit, George twisted and pointed a gun at him with his right hand when the chase reached Park Terrace. More specifically, Batista's deposition testimony reflects the following:

Q: And until you got to Park Terrace, did you say anything to him?
A: Yes.
Q. What did you say?
A: I was telling him to stop running and if he had a gun, to throw it down.
Q: Okay, but you weren't sure that he had a gun?
A: No.
Q: Okay, and you said you saw him with the gun the first time in front of 103, 105 park Terrace? . . . .
A: Yes.
Q: Okay, and how far were you at this point from him?
A: Across the street. . . .

3

A: About maybe 30, 40, 50 feet. . . .

A: He had his left hand up in the air and with his right hand, he reached and threw it up and I could see the gun go up and fall to the ground to his right side. . . .

Q: And what, if anything, did you do after he threw the gun to the ground?

A: I proceeded to walk towards him with the gun in my right hand.

Q: Did you say anything to him?

A: I said, "Keep your hands up." Maybe I might have said that. . . .

Q: Okay, and you started walking towards him and you said that he picked up his gun at some point? . . . .

A: He picked up his gun with his right hand, put his other hand down, and he pointed the gun in my direction.

Q: From the back?

A: From the side like this.

Q: Okay, so when he threw the gun to the ground, he was facing you or facing the opposite way?

A: He was facing the opposite way.

Q: Okay, so his back was towards you?

A: Yes.

Q: Okay, and he threw the gun to the ground and then he picked it back up?

A: Yes. . . .

Q: Okay, so what exactly was he doing, twisting?

A: Twisting and pointing it towards my direction.

Q: With one hand?

A: With one hand in the right hand.

Q: Where was his left hand?

A: Down.

Q: And when he pointed the gun at you, what was your reaction?

A: I fired three rounds from my gun. I brought my gun up and fired three rounds.

Q: Not exactly, but approximately how far away were you?

A: Still across the street. I had just taken one or two steps towards him.

[Pl. Exh. 3, pgs. 9-12, Doc. #38, Attach. 1]. The Estate contests whether George pointed a weapon at Batista, noting that Batista's testimony is uncorroborated, as no other officer or witness can confirm that George displayed a gun during the pursuit. [Doc. #36, Attach. 2, pg. 2]. Three shots were discharged from Batista's

4

weapon, and investigation of the incident revealed that none of the bullets fired from Batista's .9 caliber Beretta struck George.

Following Batista's discharge of those three shots, George ran along the east side of houses numbered 105 and 103 beyond the view of others and proceeded to the backyard. Batista testified that after he fired three shots at George he pursued George, but before he arrived in the backyard, he heard two additional shots. When he reached the backyard, he then discovered George leaning against a chain-link fence with two bullet wounds, one of which was a fatal shot to the head. [Def. Exh. H, pgs. 13, 33, Doc. #30, Attach. 10]. The Estate contests this, claiming that the evidence shows that Batista was alone in the backyard with George and had an opportunity to fire the two gunshots that struck George. Batista's testimony does indicate that he was alone with George in the backyard for at least a brief period of time:

> Q: Okay, when you arrived in the backyard, what did you do when you saw Mr. George?
> A: I walked up to him, I saw him bleeding, and I just looked at him, and by that time Officer Simpson arrived and I asked him to call the medics .
> . . .
> Q: Okay, and when you arrived in the backyard, was anybody else there?
> A: No.
> Q: Okay, could you see anybody in the adjoining yards?
> A: No.
> Q: Okay, you couldn't see anybody on the right-hand side of the fence where George was?
> A: Not at the time when I arrived to the backyard.
> Q: And you couldn't see anybody on the left-hand side of the house?
> A: No. . . .
> Q: You didn't see anybody, though?
> A: (No audible response).

**Q: So you didn't see Christopher Martin?**
**A: No.**
**Q: You didn't see Officer Tobin?**
**A: No.**
**Q: And did there come a time when you saw Officer Tobin?**
**A: No.**
**Q: Did there come a time when you saw Christopher Martin, Officer Martin?**
**A: No, I don't recall.**
**Q: Okay, and who was the first officer that reported to the scene after?**
**A: Officer Simpson.**
**Q: Okay, and how quickly do you think he arrived after you arrived in the backyard?**
**A: Maybe 10, 15 seconds.**

[Pl. Exh. 3, pgs. 31-33, Doc. #38, Attach. 1]. The Estate also highlights evidence

that an Officer Pasquale Speranza indicated that she was at the scene, and heard

Batista instruct George to put down his weapon. Speranza was unable to recall

whether additional shots were fired after she heard those instructions:

> The T.N.T. officer (now known to me as Officer Batista) paused before moving any further, Officer Batista then proceeded towards the rear of the home I could hear him scream loud orders. Officer Batista stated something to the effect of "Drop the Weapon" "Drop it now". The orders were loud. I don't remember if I heard any other shots fired because at that time Sgt. Pribesh was ordering me to pull back and get over to the next block (Gregory Street) in case the individual ran through the back yard out onto that street.

[Pl. Exh. 19, Doc. #39, Attach. 4].

In contrast, Sergeant Melody Pribesh's ("Pribesh") August 25, 2005 report

on the incident states:

> As I approached Columbia St. I heard several gunshots. At this point I turned towards Park Terrace and began running in that direction to assist the Officers taking gunfire. I saw Officers Speranza and Martin taking cover behind vehicles on Columbia St. There were two foot pursuits being conducted on channel one, at the same time, both of

them had similarities making it difficult to decipher the directions of the suspects being pursued. . . . I heard someone state the suspect was headed towards Gregory St. and told the Officers to head in that direction. I then heard more gunshots and ran up Park Terrace into a rear yard where it sounded like the gunshots had come from. As I got to the rear yard I saw the suspect on the ground up against a chain link fence with Officer Batista pacing back and forth. . . . I asked Officer Batista if he was ok and he said he was. I noticed that the suspect's hand was very close to his weapon which was on the ground next to him, a black semi-automatic gun, for our safety I ordered Officer Batista to move the weapon away from the suspect's hand (I was on the other side of the fence in an adjoining yard). He stated he did not want too [sic] as there was blood on it. I calmly coaxed him by slowly saying "I need you to move the gun away with your foot". Officer Batista moved the gun slowly away from the suspect to a distance where it would no longer be considered a safety hazard. . . . I then went to channel two and requested that they call the medics and have them step it up as the suspect's breathing was becoming labored. I began to instruct the officers arriving on scene to preserve the crime scene.

[Pl. Exh. 20, Doc. #39, Attach. 4].

Pribesh's report to Captain Leonard Samtulski also notes that at some point she left the scene to check on the status of Tobin who received treatment at a hospital:

I then responded to St. Vincent's hospital to check on Officer Tobin. He was talking with two detectives from the Western District State Police Major Crime Unit. . . . Officer Tobin stated he had been chasing a suspect wearing black jeans when he saw the suspect (wearing gray sweatpants) had been shot and was bleeding it was at this point that he stopped as he began to have flash backs to the night he had been shot himself. At this time I informed his nurse of the situation and she said she would call the doctor and get a sedative for Officer Tobin. Once Officer Tobin had the GSR (Gunshot Residue) completed and had been given medication I returned to the crime scene as instructed by you.

[*Id.*]

Unlike her report, Pribesh's subsequent June 25, 2009 deposition testimony indicates that Pribesh arrived immediately after George was wounded:

A: Yes. They came this way and hopped this fence, one hopped this fence, and he was on the fence when I heard some more pops; and then he was down – and when I'm watching him go over the fence, it's kind of – it was kind of like sideways on the fence; and then when he went over, he kind of did this number, like, three times, right; and then he stopped, and then the blood came, and then I had to have Officer Battista [sic] move the gun away from his hand because he was hearing me tell him that I was going to get him help.

Q: Okay, so Officer Battista chased him over to the chain link fence that he was actually –

A: Officer Battista, actually – I believe I saw Officer Battista.  He was on this side of the house.  He came up this driveway.

Q: Okay.

A: So I came in this one, and I believe Officer Simpson ended up behind me at some point, and I saw Officer Battista come in this way, and he was kind of pacing.  I originally – I believe that I was there first, but he was pacing, so it's hard to tell, and Officer Dickinson came up shortly after.  I had Battista move the gun, and I had him stand on it to keep the integrity of the gun – and – we couldn't make it safe, either.  I didn't want a child getting a hold of it.

Q: Right, right.

A: To keep it safe –

Q: Or the suspect, possibly.

A: – for the state police.  Well I had it moved away from his hand because it was in his reach. . . .

Q: You saw him on the fence?

A: On the fence, just going over.  It was like he was on the fence going over, and then just did this number like this, and I was like –

Q: Okay.

[Pl. Exh. 13, pgs. 11-13, Doc. #39, Attach. 3].

An autopsy of George reflects that he suffered "a gunshot wound to the right side of the head . . . centered at a point 1 ¾ " posterior to and 1 ¾ " superior to the external auditory canal . . . within the hair" and that the wound "pass[ed] from right to left, from back to front and upwards" and that  the bullet tract entered his skull through a hole measuring 9mm. passing through brain and exiting through his skull leaving a 12 mm. hole.  [Pl. Exh. 7, pg. 2, Doc. #39,

Attach. 2]. The autopsy also reflects that George also received a "gunshot wound of the right thigh" that fractured his kneecap. [*Id.* at 3].

Batista's deposition testimony reflects that after additional officers arrived in the backyard to secure the scene, a lieutenant immediately instructed Batista to go to a hospital for treatment and Batista was transported there in a Bridgeport police car. [Pl. Exh. 3, pg. 18, Doc. #38, Attach. 1]. Batista further testified that he was treated with a medical injection within about an hour of arriving at the hospital and that a fellow member of his unit, Officer Ronin, drove Batista to his home. [*Id.* at 21, 36]. Batista indicated that a Sergeant Leonzi of the Bridgeport Police Department prompted him to provide his clothing for investigation of the shooting. [*Id. at 22*]. Batista's testimony also reflects uncertainty as to how his clothing was collected, indicating that, while at his home, his wife and Ronin may have collected his clothing for the investigation of the shooting, and uncertainty as to whether Batista washed his hands prior to undergoing a gunshot residue test:

> Mr. Battista [sic]: I didn't collect my own evidence.
> Q: Your wife did.
> A: Placed it in a bag.
> Q: Your wife and Officer Ronin collected that evidence, right?
> A: I don't recall.
> Q: It wasn't a state police officer that collected the evidence?
> A: No, not at the time, no.
> Q: It was a Bridgeport police officer?
> A: That's who I – if I gave it to Ronin, that's who got it.
> Q: Okay, and do you think it's appropriate that one of your colleagues that works on TNT with you collect your evidence?
> A: I don't – you know, he asked me for it, I gave it to him. At the time, I didn't – you know, that's what I did.

Q: At any time from the time that you left Park Avenue to the time that you arrived at TNT, did you wash your hands?
A: I might have.
Q: Okay.
A: I don't recall.

[*Id.* at 23-24].  Batista's testimony also reflects that he took a leave from work after the shooting due to an initial belief that he had shot George:

Q: Okay, why did it take you so long to write this report?
A: I was out due to the shooting.
Q: Okay, and what was the reason you were out?  I know due to the shooting, but what happened?
A: I wasn't, you know, feeling too good about it at the time, I guess, and they told me to take my time.
Q: Okay, and you weren't feeling too good about it because you thought you shot Mr. Mr. George?
A: Yes.
Q: Okay, but you didn't tell anyone that?
A: No.
Q: Okay, and no one asked you to come in to – no one asked you to write a report until some time in September?
A: That's when I wrote the report.  I don't recall if anybody asked me to write it.  I knew I had to write one.

[*Id.* at 24-25].

In its final report dated March 30, 2006, the Medical Examiner's Office that the wounds to George were self-inflicted and that no peace officer fired a weapon that caused injury to George.  The Report reflects, however, that the Medical Examiner, pursuant to the postmortem examination performed on August 26, 2005, had been told by Bridgeport police officers that George was shot by a member of the Bridgeport Police Department:

At the time of the autopsy, history obtained from the Bridgeport Police indicated that Mr. George was shot by a police officer.  Based on this information the manner of death was originally classified as: Homicide.

Subsequent investigation which included the autopsy, test firing the weapon to determine muzzle to target distance, scene investigation and witness interviews lead to the conclusion that the police officer could not have been close enough to the victim to leave the deposits of gunshot residue on both the pants and the skin of the head and that the officer's weapon was not fired in the vicinity of the body.  Based on this and the totality of the other information available, it is concluded that the wounds are self-inflicted.  The nature of the injury to the leg is clearly accidental.  The head wound is potentially ambiguous with respect to the question of the weapon being discharged accidentally or intentionally.  Based on this the manner of death has been reclassified as: Undetermined.

[Pl Exh. 7, pg. 6, Doc. #39, Attach. 2].

The Medical Examiner's deposition testimony reflects that he reclassified the cause of George's death due to subsequent verbal reports from unidentified officers which were not documented in the records provided by the Medical Examiner that no officers were positioned close enough to George to fire the close-range shots indicated by the wound patterns:

Q: Do you remember any scientific evidence contradicting your conclusion of homicide?
A: The reason I changed my mind, okay – well, obviously, I got information that made me change my mind.
Q: Exactly.
A: Okay. That's on the record.  All right?  But the information that I got was that there was credible witness evidence that the police officer was not near him or could not have been near him when the fatal shots were discharged, and, obviously, the one fatal shot from just the autopsy examination, whoever was wielding the gun was very close to him because the weapon is close to him.  I do – I also received information that the shot to the leg – the examination of the pants disclosed evidence that the weapon was close to the pants at the time that it was discharged; again, meaning that if he's in the pants, the person wielding the weapon has to be close to him.
Q: And so what you're saying is that the only change in circumstances between your determination of homicide and undetermined is witness statements?

11

> A: Well, and the fact that things like the analysis of the – analysis of the placement of cartridge casings were – created no further inconsistencies. . . .
> Q: Now, are you aware that there were no witnesses that actually saw Mr. George get shot?
> A: Yes. . . .
> A: My determination is based on witness statements is the – that saw that the officer was not near him or could not have been near him at the time it was discharged.

[Pl. Exh. 8, pgs. 36-40, Doc. #39, Attach. 2].  The Medical Examiner acknowledges that, taken in isolation, the anatomy of the fatal gunshot wound to the head was more consistent with a common pattern in homicide than a suicide or accident. [*Id*. at 25].  In addition, the Medical Examiner testified that he met with law enforcement officials regarding the incident prior to the change in the report's conclusion.  When asked whether anyone requested that he change his report he stated:

> You know, I don't have a direct recollection of someone asking me to change it, saying please make this something other than a homicide, but certainly, obviously, people approached me and said, you know, there's information here that may be inconsistent, let's – will you take it into consideration.  So it's – I mean, obviously, someone asked me to go through the process that would lead to a change.

[*Id*. at 42].  In discussing the wound pattern, the Medical Examiner noted:

> And by the way, in general, you can't look at a wound and say it definitely was a .40 and not a .9, but the degree of destruction of his head is typically what you would expect with a .40.  It's not exclusionary, but it's a little – the injury pattern inside the head is a lot of better for a .40 than a .9, but there's a lot of different loads on .9s.

[*Id*. at 81].  Finally, the Medical Examiner acknowledges that there is no guarantee that his conclusion is correct and that he could not change his mind regarding

the cause of death:

> I mean, to get this all over to the end of the last question, okay I've been through the pattern once where I was – people led me to believe that the information I got was wrong, so I changed my mind. Can that phenomena occur again, yes.

[*Id.* at 53].

A report submitted on May 11, 2006 by the State's Attorney for the Judicial District of Fairfield details the findings of an investigation by the Connecticut State's Attorney, the Connecticut State Police Western District Major Crime Squad, the Office of the Chief Medical Examiner, and the State Forensic Science Laboratory. [Def. Exh. C, Doc. #30, Attach. 5]. The report concludes:

> No one actually observed Raylyn George at the point when he was shot. Based upon the time line of the aural and visual observation of various witnesses, it is evident that P/O Batista was not even in the rear yard of 103/105 Park place when the last two shots were fired. There is no evidence placing any other person in near proximity to George at any time. The undersigned concludes, on the basis of statements of all of police as well as civilian witnesses, as well as the State Police crime scene investigation, all forensic examinations, including the autopsy conducted by the State's Chief Medical Examiner, that no peace officer fired a weapon that caused any injury to Raylyn George. . . . The precise mechanism of Mr. George's death remains a matter of conjecture. What is known is that it occurred as he was fleeing police and, likely, attempting to scale a four foot high fence while holding a stolen, locked and loaded handgun in his right hand. Consequently, there is no evidence that any peace officer's actions were inappropriate.

[*Id.*].

The report also indicates that gunshot residue swabbing reflected only a minimal finding in the form of lead on George's left hand, despite suggestion that George's wound to the right side of his head was self-inflicted, but notes that the

lack of a conclusive gunshot residue finding may be due to large amounts of blood that George expended onto his right hand.  [*Id*.].  In turn, the report notes that a swab of Batista's hands provided a negative result despite his statements that he fired three shots from his gun at George before George entered the backyard area.  [Pl. Exh. 3 at 12, Doc # 38, Attach. 1].  Additionally, the report indicates that the Glock .40 caliber semi-automatic pistol identified as the source of the shots that hit George was stolen in a residential burglary three weeks before the shooting, and that a fingerprint on the magazine did not match any known fingerprints, including those of George or members of the Bridgeport Police Department.  [*Id*.].

The Estate filed its initial Complaint on July 10, 2008, and its Amended Complaint on September 12, 2008.  [Docs. ##1, 9, 11].  On September 2, 2008 the Defendants filed a Motion to Dismiss for Lack of Jurisdiction, and on October 17, 2008, the Defendants filed a Motion for a More Definite Statement regarding the Estate's Amended Complaint.  [Docs. ##7, 14].  On December 28, 2008, the Estate filed a second Amended Complaint, and on January 15, 2009, the Court denied the Defendants' Motion to Dismiss and Motion for More Definite Statement as the Defendants "informed the Court that they [would] answer the Amended Complaint."  [Doc. #23].

Standard

Summary judgment "should be rendered if the pleadings, the discovery

and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Court "construe[s] the evidence in the light most favorable to the non-moving party and . . . draw[s] all reasonable inferences in its favor." *Huminski v. Corsones*, 396 F.3d 53, 69-70 (2d Cir. 2004) (internal citations omitted). "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315 (2d Cir. 2006) (internal citations omitted). "The moving party bears the burden of showing that he or she is entitled to summary judgment." *Huminski*, 396 F.3d at 69. "[T]he burden on the moving party may be discharged by 'showing'—that is pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (internal citations omitted). "If the party moving for summary judgment demonstrates the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor." *Burt Rigid Box, Inc. v. Travelers Prop. Cas. Corp.*, 302 F.3d 83, 91 (2d Cir. 2002) (internal citations omitted).

Yet, a party opposing summary judgment "must offer some hard evidence" in support of its factual assertions, *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998), such that "'there is sufficient evidence favoring the nonmoving

party for a jury to return a verdict for that party.'" *Golden Pac. Bancorp v. F.D.I.C.*, 375 F.3d 196, 200 (2d Cir. 2004) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Evidence that is "merely colorable" or "not significantly probative" is insufficient to prevent a court from granting summary judgment. *Anderson*, 477 U.S. at 249-50. Thus, mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

## Estate's Claims Against John Doe One and John Doe Two

As a preliminary matter, the Estate concedes that it abandons any claims against John Does One and Two, and summary judgment is therefore granted as to those unnamed Defendants. [*See* Doc. #36, Attach. 1, pg. 17].

## Estate's 42 U.S.C. § 1983 Claim Against Batista

The Defendants contend "[s]imply put, chasing a suspected armed suspect and firing three shots after he fails to comply with orders and points a weapon at an officer would not amount to a constitutional violation. These are the only facts supported by evidence which described Officer Batista's conduct. Such conduct clearly would not amount to a constitutional violation" and the "plaintiff's speculative allegations cannot possibly be sufficient to overcome Officer Batista's entitlement to qualified immunity." [Doc. #30, Attach. 1, 10]. As a result of careful review of the record and construing the evidence in the light most

favorable to the Estate, as the non-moving party, the Court disagrees with the Defendants' characterization of the record and conclusion as to the claim against Batista.

The Estate alleges Section 1983 liability, claiming that "Plaintiff suffered deprivation of his federal civil rights in that, as a result of the Defendant's [sic] conduct, the Plaintiff lost his life" and that "Defendants BATISTA , and TOBIN, acted with gross negligence or with reckless disregard to the health, safety and civil rights of GEORGE." The Defendants correctly identify that the "plaintiff does not allege a violation of any particular federal statute or constitutional provision." [Doc. #30, Attach. 1, 5]. The Estate fails to specify a particular statute or constitutional provision in its response, but instead notes evidence creating an issue of material fact as to whether George's death was the result of homicide rather than a self-inflicted gunshot, and includes an argument that Batista used excessive force by firing at the Estate and contends that the City failed to "properly train and discipline in (a) the proper use of deadly force, (b) limitations and procedures on their authority as police officers in terms of investigation of an officer-related shooting, [and] (c) the requirements for gunshot residue testing of officers and the importance of preserving evidence." [Doc. #36, Attach. 1, 18]. Accordingly, the Court construes the Estate's Section 1983 claim as an excessive force claim pursuant to the Fourth Amendment.

The Fourth Amendment to the United States Constitution mandates "the right of the people to be secure in their persons, against unreasonable searches

17

and seizures, shall not be violated . . . ."  U.S. Const. Amend. IV.  In turn, "[t]he

Fourth Amendment's search and seizure provisions are applicable to [state]

defendants through the Fourteenth Amendment's Due Process Clause."

*Tenenbaum v. Williams*, 193 F.3d 581, 602 n. 14 (2d Cir. 1999) (citing *Mapp v.*

*Ohio*, 367 U.S. 643, 655 (1961)).  The Supreme Court has explicitly ruled that "*all*

claims that law enforcement officers have used excessive force – deadly or not –

in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness'

standard, rather than under a 'substantive due process' approach."  *Graham v.*

*Connor*, 490 U.S. 386, 395 (1989).  Further, "a Fourth Amendment seizure does not

occur whenever there is a governmentally caused termination of an individual's

freedom of movement . . . nor even whenever there is a governmentally caused

and governmentally *desired* termination of an individual's freedom of movement .

. . , but only when there is a governmental termination of freedom of movement

*through means intentionally applied*."  *Brower v. County of Inoyo*, 489 U.S. 593,

596-97, (1989).  Additionally,

> Violation of the Fourth Amendment requires an intentional acquisition
> of physical control.  A seizure occurs even when an unintended person
> or thing is the object of the detention or taking, but the detention or
> taking itself must be wilful.  This is implicit in the word "seizure," which
> can hardly be applied to an unknowing act.

*Id.* at 596; *see also Cardona v. Connolly*, 361 F. Supp. 2d 25, 33 (D. Conn. 2005)

(noting that plaintiff failed to provide evidence that a police dog bite was the

result of an intentional act due to lack of evidence that the dog was ordered to

attack plaintiff).

Fourth Amendment assessment of whether the degree of force used by an officer to effect a seizure is "reasonable" requires "careful balancing of the nature and quality of the individual's Fourth Amendment interest against the countervailing governmental interest at stake." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citation and quotation marks omitted). The inquiry demands "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. Reasonableness is judged from the perspective of a "reasonable officer on the scene," rather than in hindsight, and must account for the reality that officers confront split second judgments regarding the necessary amount of force in tense, uncertain, and rapidly evolving circumstances. *Id*. at 396-97. Yet, "[g]iven the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty America v. Town of West Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (internal citation omitted).

In applying the standard that governs excessive force claims, the Court finds that summary judgment against the Estate as to the claim against Batista is inappropriate. A reasonable trier of fact may conclude that Batista seized, and used excessive force in seizing, George. More specifically, a jury must

determine, based on the testimonial, forensic, and circumstantial evidence, whether Batista fired the shots that injured and killed George, and if so, whether such conduct was reasonable given the nature of the pursuit.  There are several factual issues requiring a jury's determination and reconciliation.  First, whether George had the gun from which the fatal shot was fired.  Batista contends that after he fired three shots at him, George stopped, raised his left hand, threw his gun down and then with his back to Batista retrieved the gun and ran.  Second, was George alone in the backyard when the fatal shot was fired.  Batista pursued George and may have been alone with George when the shots were discharged.  Third, whether Batista shot George.  Both Batista and the Medical Examiner's initial report concluded that Batista fired the shots that wounded and killed George.  Fourth, witness credibility as there is evidence of consciousness of guilty and failure to comply with proper investigative procedure.  Specifically, the facts indicate that Batista was immediately removed from the scene prior to the State officers' investigation of the shooting, that Batista was sedated or otherwise medicated although he was not wounded, he was permitted to go home where he removed his clothing outside of the presence of law enforcement and allowed to proffer a uniform purporting to be the one he wore during the shooting which, by virtue of the procedure used, could not be verified.  Batista admitted that a criminal suspect would not be allowed to do what he has allowed to do.  Finally, Batista failed to immediately process the scene and collect evidence and the City failed to preserve the condition of Batista's hands and to properly test

his hands for gunshot residue.  While acknowledging that the multiple pursuits of suspects resulted in a chaotic scene, the responding officers' accounts of the incident reflect inconsistencies regarding the timing, circumstances, and events leading up to and immediately following George's fatal wounding, that are best left for a jury to resolve.  As the evidence reflects that Batista was the closest in proximity to George at the time George sustained his gunshot wounds, this case will turn on a jury's assessment of his credibility and interpretation of his testimony to resolve ambiguity as to whether Batista fired the shots that hit George, and whether George actually brandished a gun or otherwise posed a threat that would justify the use of such force.

The Medical Examiner's handling of and comments concerning this matter are illustrative.  First, the Medical Examiner concluded that George's death was a homicide.  Months later, he revised his conclusion and ruled that it was self-inflicted and ambiguous as to whether it was accidental or intentional.  At his deposition, after having examined all of the evidence upon which his revised finding was based, he testified that he could change his mind again.  The record in this case is not conclusive.

 In sum, a jury must decide whether George's death was due to Batista's intentional use of force and if so, whether such force was objectively unreasonable force to apprehend George.  Assuming but not finding that George was shot at close range as the Medical Examiner's report concluded, a jury's finding that Batista acquired and intentionally fired the semiautomatic weapon at

that close range, and that George did not pose an immediate threat to the safety of the officers or others, coupled with consideration of the extent to which George was no longer resisting or attempting to evade arrest, could support a jury's finding in the Estate's favor.

Analysis of Batista's Qualified Immunity Defense

The doctrine of qualified immunity shields government officials performing a discretionary function "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Giles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In *Saucier v. Katz*, 533 U.S. 194, 121 (2001), the Supreme Court mandated a two-step sequence for resolving qualified immunity claims, in which a court first determined whether the facts shown by a plaintiff constituted a violation of a constitutional right, and then upon the plaintiff's satisfaction of the first step, decided whether the right at issue was "clearly established" at the time of the alleged misconduct. *Id.* at 201.

In *Pearson v. Callahan*, 555 U.S. 223, 128 S.Ct. 808 (2009), however, the Supreme Court ruled that the sequence mandated by *Saucier* was optional, and that lower courts have discretion as to which of the two prongs of the qualified immunity analysis to address first.  *Id.* at 817.  To constitute a clearly established right, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  *Anderson v.*

*Creighton*, 483 U.S. 635, 640 (1987).  Accordingly, Batista receives immunity if his conduct was "objectively legally reasonable in light of the legal rules that were clearly established at the time it was taken."  *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 66 (2d Cir. 1999)).

As discussed *supra*, and upon drawing reasonable inferences in the Estate's favor at the summary judgment stage, the Court finds that the facts that the Estate has alleged or shown make out a violation of a constitutional right. *See Pearson*, 128 S.Ct. at 816 (discussing the two prongs identified in *Saucier*, 533 U.S. 194).

Upon determining that a reasonable trier of fact could conclude that Batista's conduct violated George's Fourth Amendment rights, the Court notes that presently unresolved and sharply divergent interpretations of the factual record, including the manner in which the shots that hit George were discharged and whether George brandished a gun or otherwise constituted a threat immediately prior to Batista's alleged use of excessive force, bars an objective analysis as to whether reasonable officers would believe that the alleged use of force was lawful in order to complete George's arrest.  On the one hand, factual findings could support a conclusion that Batista's alleged use of force was both necessary and reasonable, while a finding that Batista used said force at close range after Batista was no longer resisting would undermine such a conclusion.

Accordingly, the Court finds that although qualified immunity is to be

resolved "at the earliest possible stage in litigation" *Hunter v. Bryant*, 502 U.S. 224, 227 (1991), it is unavailable to Batista at this summary judgment stage.

## 42 U.S.C. § 1983 Claim Against Tobin

The Second Circuit clearly requires the personal involvement of an individual defendant in an alleged constitutional deprivation as a "prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 479, 484 (2d Cir. 2006) (citing *Wright v. Smith*, 496 F.3d 496, 501 (2d Cir. 1994)). "A police officer is personally involved in the use of excessive force if he either: (1) directly participates in an assault; or (2) was present during the assault, yet failed to intercede on behalf of the victim even though he had a reasonable opportunity to do so." *Jeffreys v. Rossi*, 275 F. Supp. 2d 463, 474 (S.D.N.Y. 2003) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997)). "A plaintiff need not establish who among a group of officers, directly participated in the attack and who failed to intervene." *Id.* Nevertheless, "[a] police officer cannot be held liable in damages for failure to intercede unless such failure permitted fellow officers to violate a suspect's clearly established statutory or constitutional rights. . . ." *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 384 (D. Conn. 2009) (quoting *Ricciuiti*, 124 F.3d at 129). The record is bereft of evidence of any actions taken by Tobin in furtherance of the alleged violation of George's Fourth Amendment rights or failure to prevent any other named Defendant, namely Batista, from doing so. Assuming, but not deciding, that Batista used excessive

force against George, there is indeed no indication that Tobin directly participated or was even present during such an assault and therefore there is no evidence to support a finding that he had a reasonable opportunity to intercede on George's behalf.   Accordingly, the Defendants' motion is granted as to Tobin.


42 U.S.C. § 1983 Claim Against the City

A municipality cannot be held liable on a *respondeat superior* theory. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978).  Specifically, the Supreme Court held that "a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is liable under § 1983."  *Id.* at 694.  To establish a municipality's liability pursuant to 42 U.S.C. § 1983, a plaintiff must therefore prove that the alleged violation of a federally protected right was caused by a municipal policy, a municipal custom or practice, or the decision of a municipal policymaker with final policymaking authority.  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988).  Further, a plaintiff must demonstrate that "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (emphasis in original).  "That is, a plaintiff must show that the municipal action was taken with the requisite culpability and must demonstrate a direct causal link

between the municipal action and the deprivation of federal rights." *Id.*

The Estate contends that the City failed to properly train and discipline officers regarding the use of deadly force, limitations on officers' authority and procedures relating to investigation of officer-related shootings and gunshot residue testing of officers. The Estate also notes that the City admitted via responses to Requests for Admission that Batista acted at all times toward George in accordance with a custom, policy, or practice of the Bridgeport Police Department, and cites a series of incidents, dating back to 1970, relating to lawsuits, accusations, and settlements involving allegations of misconduct by Bridgeport police officers. [Doc. #36, Attach. 1; Pl, Exh. 23, Doc. #39, Attach. 5].

The Estate asserts:

> Here, the exhibits attached hereto prove that the City of Bridgeport has a long history, (dating from 1985), of a custom, policy or practice of allowing [its] officers to use excessive force against citizens for plaintiff to show a causal link between the injuries incurred in this instance and those continuous violations in the past; that is, a wilful failure to investigate and discipline [its] officers when appropriate, shows an acquiescence of the City to allow [its] officers to use excessive force without any repercussions – sometimes promotions.

[Doc. #36, Attach. 1, 32]. The Defendants note in response:

> The Plaintiff . . . [cites] approximately 17 cases or incidents from 1970 to 2008 involving different issues including use of force, false arrest, unlawful entries and some disciplinary incidents where discipline was or was not administered. The random citation of cases or incidents over a period of approximately 38 years during which the Bridgeport police have been involved in literally thousands of arrest, use of force and potential disciplinary incidents could somehow create an issue of fact regarding the potential liability of the City of Bridgeport is also incomprehensible.

[Doc. #43, 11].

In *City of Canton v. Harris*, 489 U.S. 387 (1989), the Supreme Court held that a city's failure to train subordinates can satisfy *Monell's* policy or custom requirement if the city's need to act is sufficiently obvious and the inadequacy of current practices reflect that city's deliberate indifference *Id*. at 390. The Second Circuit has explained the proper analysis of failure to train allegations within the *Monell* framework:

> Specifically, *Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its surbordinates' unlawful actions. Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of *Monell*. It follows therefore that a government supervisor who fails to take obvious steps to prevent manifest misconduct is subject to suit under § 1983 in certain, limited circumstances. . . . Although *City of Canton* addressed a claim of failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims. . . . Plaintiffs are required to submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights.

*Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (internal citations and quotation marks omitted).

The Court shares the Defendants' observation that the Estate presents a series of incidents from a broad time period regarding a variety of issues and as a result most of the incidents are not probative as to whether the municipality, through inaction, has fostered a disregard of suspects' constitutional right not to be subjected to excessive force. Additionally, it is important to note that most of

the incidents reflect complaints and cases that subsequently settled as opposed

to matters that were resolved on the merits.

In assessing similar evidence presented in support of a failure to train

argument, the Court of Appeals for the District of Columbia observed:

> Plaintiffs urge us to include and consider . . . bare complaints, pleadings, and press clippings, unsubstantiated by testimony, concerning alleged incidents of the use of excessive force by police officers.  As the district court recognized, these hearsay items could show no more than notice to the city that allegations had been made. . . .  We therefore cull out such items as failing to show actual, as distinguished from merely alleged occurrences.

*Carter v. District of Columbia*, 795 F.2d 116, 123 (D.C. Cir. 1986).

In reviewing the plaintiff's proof of actual occurrences the D.C. Circuit observed:

> This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer indulgence in the use of excessive force, persisting in the District because of the [police department's] tacit approval.  We can glean nothing from the seven deaths [in incidents involving police over a two-month period] . . . because the plaintiffs presented no detail at all on these incidents.  The remaining occurrences are scattered and do not coalesce into a discernible "policy."  If the evidence presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability.

*Id*. at 123.

Notably, the *Carter* court contrasted its case with the Fifth Circuit's

"paradigm case of pervasive misconduct subjecting a municipality to § 1983

liability," in which evidence showed that 75-80% of the municipality's police

officers carried 'throw down' guns intended for planting on unarmed suspects to

justify a shooting after the fact.  *Id*. at 124 (citing *Webster v. City of Houston*, 689

F.2d 1220 (5th Cir. 1982), vacated 735 F.2d 838 (5th Cir.) (en banc), *aff'd in part*

*and rev'd in part*, 739 F.2d 993 (5th Cir. 1984) (en banc)).  Accordingly, the Estate, at best, has provided allegations regarding varied forms of police misconduct, but these incidents fail to coalesce to establish a pervasive pattern demonstrating Bridgeport's indulgence of excessive force.  Further, the Estate fails to provide evidence regarding Bridgeport's training methods as to excessive force and disciplinary procedures and protocols regarding accusations of excessive force.  Accordingly, the Estate fails to meet its burden on the basis of evidence regarding the Department's history.  *See Carter*, 795 F.2d at 123; *see also Dockery v. Tucker*, No. 97-CV-3584 (ARR) 2006 WL 5893295 at *24 (E.D.N.Y., Sept. 6, 2006) (citing *Carter* in support of conclusion that the plaintiff "failed to present any evidence from which a reasonable juror could conclude that the District was the moving force behind any violation of his constitutional rights. . . .").

However, the analysis does not end here.  As noted by the Estate, the Defendants unequivocally admit in response to the Estate's Requests for Admissions that at all relevant times, the individual Defendants, including Batista, acted toward the Estate in accordance with Bridgeport training and supervision, and in accordance with a Bridgeport custom, policy or practice.  Under Federal Rule of Civil Procedure 36(b):

> A matter admitted under [Rule 36] is conclusively established unless the court on motion permits withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits.  An admission under this rule is not an admission for any other purposes and cannot be

used against the party in any other proceeding.

In the Second Circuit, admissions may be used for summary judgment purposes. *Donovan v. Carls Drug Co.*, 703 F.2d 650, 651 (2d Cir. 1983), rejected on other grounds by *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133-34 (1988); *see also Virga v. Big Apple Const. & Restoration Inc.*, 590 F. Supp. 2d 467, 471 (S.D.N.Y. 2008). In addressing admissions similar to those presented in the instant case, the Second Circuit while remanding a judgment for consideration of a city's municipal liability stated:

> We note that the City has admitted, in its supplemental . . . responses to Russo's requests for admissions, that "all individual defendants . . . . acted toward the Plaintiff in accordance with custom, policy and practice." We leave it for the district court to consider, in the first instance, the significance of this concession.

*Russo v. Bridgeport*, No. 05-4302-cv, 2007 U.S. App. LEXIS 16171, n. 15 (2d Cir. Feb. 27, 2007). Although the Second Circuit in *Russo* opted not to address the significance of the admissions, this language suggests that such admissions may serve to establish municipal liability by virtue of an interpretation that through its admissions the City concedes that if Batista is found to have violated George's constitutional rights, such violation occurred pursuant to the City's custom, policy and practice, and that the municipality is therefore liable as well.[1]

----

[1] Notably, in its initial opinion, the Second Circuit concluded "[w]e understand [the defendant's admission] to constitute an admission that, if [the officers] are ultimately held to have violated Russo's constitutional rights, then municipal liability against the City will be appropriate as well." *Russo v. City of Bridgeport*, 479 F.3d 196, 212 (2d Cir. 2007) subsequently amended by *Russo v. City of Bridgeport*, No. 05-4302-cv, 2007 U.S. App. LEXIS 16171 (2d Cir. Feb. 27, 2007). As noted, the Second Circuit amended its decision to leave assessment of the

As the municipal defendant does not address the Estate's argument regarding the significance of its admissions, and has not sought to withdraw or otherwise limit the scope of its admissions pursuant to Rule 36(b), the admissions serve to create an issue of material fact as to the City's liability at the summary judgment stage and will continue to have an evidentiary effect absent amendment or withdrawal.  Accordingly, summary judgment is denied.

## 42 U.S.C. § 1985 Claim Against Batista and Tobin

The Estate also seeks relief pursuant to 42 U.S.C. § 1985.  Section 1985 prohibits private individuals from participating in certain conspiracies designed to deprive individuals of their civil rights.  In particular, as recognized by the Supreme Court, the statute governs five categories of conspiracy:  "(1) interference with federal officers, (2) interference with the administration of justice in federal court, (3) interference with the administration of justice in state courts, (4) interference with private enjoyment of equal protection of the law and equal privileges and immunities, and (5) interference with the right to support candidates in federal elections."  *Bishop v. Best Buy, Co. Inc.*, No. 08 Civ. 8427(LBS) 2010 WL 4159566 at *13 (S.D.N.Y. Oct. 13, 2010) (citing *Kush v. Rutledge*, 460 U.S. 719, 724 (1983)); *see also Daigneault* v. *Eaton Corp.* No. 3-06-cv01690, 2008 WL 410594 at *7 (D. Conn. Feb. 12, 2008).

---

significance of the defendant's admission to the district court.

While the Estate fails to specify under which provision of Section 1985 it brings its claim, the only applicable provision of Section 1985 are those governing interference with the administration of justice in state courts, and interference with the private enjoyment of equal protection of the law and equal privileges and immunities, as the Estate alleges that the Defendants took efforts to conceal evidence and otherwise interfere with the state officer's investigation of George's death and deprived of his "federal civil rights to the pursuit of life, liberty and the pursuit of happiness." [Doc. #22, 11].

However, the Estate fails to provide sufficient evidence of a race-based or otherwise class-based invidious discriminatory animus to create an issue of material fact as to its conspiracy claim. As previously observed by this Court:

> In order to maintain a suit under the equal rights portion of § 1985, which is codified in the first part of 42 U.S § 1985(3), a plaintiff must show that his rights were deprived on account of class-based animus. Additionally, because of similar language in portions of 42 U.S.C. § 1985(2), the Supreme Court has indicated that a similar requirement applies under the interference with state courts portion of the statute.

*Daigneault*, 2008 WL 410594 at *8 (internal citations omitted). As explained by the Second Circuit:

> Congress added the restricting equal protection language [to § 1985] solely because, notwithstanding its broad concern with the restoration of civil authority [in the wake of violent resistance to federal reconstruction upon the founding of the Ku Klux Klan in 1866], Congress was worried about the constitutional difficulties inherent in an unlimited proscription of violence. Congress did not want to federalize all state tort law. No such concerns attended the enforcement of a law designed to give effect to Congress' broad and undisputed power to protect the jurisdiction and the process of the federal courts.

32

*Keating v. Carey*, 706 F.2d 377, 385 (2d Cir. 1983) (internal citations omitted).

While the Estate's Amended Complaint includes allegations that the Defendants "conspired and agreed to cover up the circumstances surrounding the death of GEORGE because he was a black male" [Doc. # 22, 10], the Estate fails to provide evidence reflecting such animus on the part of the Defendants.  At best, the Estate underscores that the targets of the planned arrest at Marina Village were all either African-American or Latino, and past allegations of racial intolerance against the department generally.  The Estate however, offers no evidence specific to these Defendants, other officers connected to the scene of the shooting and its investigation, or other facts relating to the shooting and its investigation to support and inference of class-based animus.


<u>Conclusion</u>

Pursuant to the foregoing analysis, the Defendants' motion for summary judgment [Doc. #30] is GRANTED as to the Estate's Section 1983 claims against John Doe One and John Doe Two, Section 1983 claim against Tobin, and also as to the Estate's Section 1985 conspiracy claim, and DENIED as to the Estate's Section 1983 claims against Batista and the City.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut:  March 31, 2011

33